J-S29030-22

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

COMMONWEALTH OF PENNSYLVANIA : IN THE SUPERIOR COURT OF
                                        :            PENNSYLVANIA
                                        :

                  v.                        :
                                          :
                                          :

MARLIN KELLY                        :
                                          :
                 Appellant       :    No. 39 WDA 2022

Appeal from the PCRA Order Entered December 20, 2021
In the Court of Common Pleas of Beaver County
Criminal Division at No. CP-04-CR-0000133-2013

BEFORE:   PANELLA, P.J., MURRAY, J., and COLINS, J.[*]

MEMORANDUM BY MURRAY, J.:         **FILED: SEPTEMBER 12, 2022**

     Marlin Kelly (Appellant) appeals from the order denying, after an evidentiary hearing, his first petition filed pursuant to the Post Conviction Relief Act (PCRA), 42 Pa.C.S.A. §§ 9541-9546.  Upon review of the record and applicable law, we incorporate the PCRA court's comprehensive opinion and affirm.[1]

---

[*] Retired Senior Judge assigned to the Superior Court.

[1] The opinion is 51 pages and addresses issues Appellant does not argue in his brief.  The PCRA court explained, *inter alia*, that it detailed the facts and procedural history "due to the numerous issues" Appellant raised in his Pa.R.A.P. 1925(b) statement, "the gravity of this case, and for the convenience of any person reviewing this case[.]"  PCRA Court Opinion, 12/20/21, at 1.

Appellant is serving a mandatory life sentence for second-degree murder, second-degree murder of an unborn child, and conspiracy.[2]  This Court affirmed Appellant's sentence on direct appeal, and the Pennsylvania Supreme Court denied allowance of appeal.[3]  We summarized the underlying facts as follows:

> Around August 2012, [Appellant] became involved in a heroin-dealing operation with three other men: Stephen Murray ("Murray"), Murray's brother, Herbert Murray ("Herbert"), and Tyrone Fuller ("Fuller").  In early October 2012, a disagreement among the four divided the group into two enterprises: [Appellant] with Fuller, and Murray with Herbert.  On October 21, 2012, Murray stole approximately six bricks of heroin that had belonged to [Appellant].  After Fuller discovered that Murray had taken the heroin, and was selling it to Fuller and [Appellant's] usual customers, [Appellant] and Fuller formed a plan to retrieve the heroin by robbing Murray at gunpoint.
>
> [Appellant] and Fuller enlisted the help of James Leo ("Leo"), a heroin addict who frequently provided transportation for Fuller in exchange for heroin.  Fuller and [Appellant] asked Leo to buy heroin from Murray, so that Fuller and [Appellant] could determine where [Murray] lived.  In exchange, Fuller and [Appellant] would provide the buy money and Leo could keep the heroin that he purchased.
>
> Leo agreed to the arrangement and on October 28, 2012, drove [Appellant] and Fuller to Murray's apartment building.  Leo called Murray and arranged to buy the heroin.  [Appellant] and Fuller, both armed with handguns, ascended the exterior stairs of the apartment building, and hid in a shadowy area in the stairwell, waiting to ambush whoever met with Leo.

---

[2] 18 Pa.C.S.A. §§ 2502(b), 2604(b), 903(a)(1).

[3] Appellant was tried twice.  This Court reversed Appellant's first conviction and granted a new trial after concluding the trial court's, "failure to sustain a challenge for cause as to Juror No. 1 constitute[d] reversible error." **Commonwealth v. Kelly**, 134 A.3d 59, 65 (Pa. Super. 2016).

> While [Appellant] and Fuller were waiting, someone approached their position, causing them to retreat to another floor. [Appellant] stopped outside of the front door to Murray's apartment. At that moment, Murray's girlfriend, Conekia Finney ("Finney"), opened the door, startling [Appellant], and causing him to point his gun into the doorway and pull the trigger. Finney was seven months pregnant with her daughter, Sekiah. After realizing he had shot someone, [Appellant] fled the scene with Fuller following close behind, unaware of what had happened. Both Finney and Sekiah died as a result of the gunshot wound.
>
> Several days later, [Appellant] and Fuller were apprehended. [Appellant] was charged with criminal homicide, criminal homicide of an unborn child, robbery, and conspiracy to commit robbery.

***Commonwealth v. Kelly***, 192 A.3d 256 (Pa. Super. May 17, 2018) (unpublished memorandum at *1), ***appeal denied***, 197 A.3d 224 (Pa. Nov. 15, 2018).

On August 5, 2019, Appellant filed a *pro se* PCRA petition raising more than 10 claims. The PCRA court[4] appointed counsel, who filed an amended petition which included Appellant's *pro se* issues, along with three additional issues. Thereafter, the case "experienced some delays due to the COVID-19 pandemic." PCRA Court Opinion, 12/20/21, at 6 (footnote omitted). With the PCRA court's permission, Appellant's first appointed counsel withdrew his appearance. The PCRA court appointed current counsel, who filed a second amended petition raising more issues. The PCRA court observed that "[e]ach

---

[4] The Honorable Kim Tesla presided at trial and the PCRA proceedings.

of [Appellant's] eighteen claims assert that his trial counsel was ineffective."

*Id.* at 8.

The PCRA court held an evidentiary hearing on September 27, 2021. Appellant testified and presented testimony from trial counsel, Stephen Colafella, Esquire. The Commonwealth did not present any witnesses. Relevant to this appeal, Appellant testified as follows:

PCRA COUNSEL. And to your recollection, do you recall discussing the trial strategy in both trial one and trial two?

A. Yes.

Q. To your recollection, did it change?

A. It was about the same.

PCRA COUNSEL: Thank you, [Appellant].

THE COURT: Cross-examination.

COMMONWEALTH: Thank you.

Q. Good morning, [Appellant].

A. Good morning.

Q. [Appellant], you had said when [PCRA counsel] asked you about Colafella questioning did you go running to the DA's Office, you said it threw you for a loop, I think those were your words?

A. Yeah.

Q. Why did it throw you for a loop? What do you mean by that?

A. Because like that's not something we discussed. Like we had went over a few, you know, a few questions before, but that's, that's not one of the questions we had, you know what I mean, had discussed.

Q. Did it, it threw you for a loop because you knew that that's generally not something you're allowed to bring up in a trial?

A. I mean, no. I mean I'm not an attorney, but my thing is, … if we discussed something, you know what I mean, going one way and then something else is thrown in there, that's not part of what we discussed. It kind of like, you know what I'm saying, it kind of threw me for a loop. …

Q. You had, basically, and I'm paraphrasing, you had no knowledge that a question like that would be inadmissible?

A. Yeah, correct.

Q. But you also said it threw you for loop because that wasn't one of your rehearsed questions, is that what you're saying?

A. Yes. Plus he, he told me before that … like basically, yeah, it was just something we hadn't discussed before.

Q. **But you knew the whole, the whole point of this trial was Tyrone Fuller was a snitch, Tyrone Fuller got a deal, Tyrone Fuller was lying, right**?

A. **Yes**.

Q. **And that you weren't, right**?

A. **Correct**.

Q. You weren't, you stood your ground, right?

A. Correct.

Q. And you, you heard [your trial counsel, Mr.] Colafella say that in his opening, that you were standing your ground, right?

A. Correct.

Q. And you agree with it, right?

A. Correct.

Q. Because that's what you were trying to portray, right, that you were standing your ground, you weren't lying?

A. Yeah, I wasn't lying, correct.

Q. And your story, and I'm paraphrasing, but your, your defense was going to be, even though Leo dropped you guys off in the area of Smoke Murray's house, that Tyrone Fuller went to Smoke's house, you went elsewhere, right, that was your whole strategy?

A. Correct.

Q. And Tyrone Fuller comes on board later with the Commonwealth and says both of you were at Smoke Murray's house, and that is a lie, that was what your understanding of what the strategy was, is that fair to say?

A. Correct.

Q. And you were confident in Mr. Colafella's abilities –

A. Correct.

Q. -- is that right? Obviously, you were convicted the first time, but he filed an appeal on your behalf, right?

A. Yes.

Q. And he was successful in that appeal, right?

A. Yes.

Q. And you felt comfortable with the amount of times that he met you. You had testified in the first trial, right?

A. Yes.

Q. He had gone over that with you before, right?

A. Yes.

Q. And you felt comfortable testifying a second time because the rapport that you had with Mr. Colafella because of the abilities that you knew Mr. Colafella had, right?

A. Yes.

Q. And when Mr. Colafella says to the jury, and you heard this, you were present for the opening, right, that you were standing your ground, you thought, okay, this sounds good, this is in line with what the strategy is, right?

A. More or less, yes.

N.T., 9/27/21, at 105-09 (emphasis added).

At the conclusion of the hearing, the PCRA court stated:

At this particular point, both side's counsel ha[ve] taken a look at the record. This is an extensive case. A case that has had, we'll just say, had a lot of time and a lot of effort by both the Commonwealth and the defense in this case. We've waited for this PCRA petition. Obviously, we've allowed amendments on two different occasions. We've had testimony.

I think, at this particular point, do[] both counsel agree that they would like to submit briefs based upon a transcript record to the [PCRA c]ourt on the legal issues before it so that that would be an aid in the [c]ourt deciding this Postconviction Collateral Relief Petition?

N.T., 9/27/21, at 114. The parties expressed their desire to file briefs, and Appellant's counsel stated he would order the transcript from the PCRA hearing. *Id.* at 115. The PCRA court stated that Appellant's brief would be due within 30 days of Appellant receiving the PCRA hearing transcript, and the Commonwealth's brief would be due within 30 days of receiving Appellant's brief. *Id.* at 116.

On December 20, 2021, the PCRA court entered an order and opinion denying relief. Appellant timely appealed. The PCRA court did not order Appellant to file a Pa.R.A.P. 1925(b) concise statement. The court stated it

had "explained its reasons for denying each and every one of [Appellant's] PCRA claims in its December 20, 2021 opinion, which is attached and incorporated by reference." Pa.R.A.P. 1925(a) Opinion, 1/13/22.

On appeal, Appellant claims:

I. The PCRA Court erred in denying relief where [Appellant] established trial counsel's ineffective assistance for pursuing an unreasonable trial strategy that implicated [Appellant's] right to remain silent; for failing to confer with [Appellant] regarding a line of questioning that would infringe [upon] his Fifth Amendment Rights; and for failing to include [Appellant] in discussions at sidebar and during in-chambers meetings, where the focus of those discussions implicated [Appellant's] constitutional rights.

Appellant's Brief at 4.

In reviewing these claims, we adhere to the following authority:

To be eligible for PCRA relief, a petitioner must prove by a preponderance of the evidence that his conviction or sentence resulted from one or more of the enumerated circumstances found at 42 Pa.C.S. § 9543(a)(2) (delineating the eligibility requirements of the PCRA). A petitioner also must demonstrate that the issues raised in his PCRA petition have not been previously litigated or waived. *Id.* at § 9543(a)(3).

\*\*\*

… It is well-settled that counsel is presumed to have been effective and that the petitioner bears the burden of proving counsel's alleged ineffectiveness. ***Commonwealth v. Cooper***, 596 Pa. 119, 941 A.2d 655, 664 (2007). To overcome this presumption, a petitioner must establish that: (1) the underlying substantive claim has arguable merit; (2) counsel did not have a reasonable basis for his or her act or omission; and (3) the petitioner suffered prejudice as a result of counsel's deficient performance, "that is, a reasonable probability that but for counsel's act or omission, the outcome of the proceeding would have been different." ***Id.*** A PCRA petitioner must address each of these prongs on appeal. ***See Commonwealth v. Natividad***, 595 Pa. 188, 938 A.2d 310, 322 (Pa. 2007) (explaining that

- 8 -

> "appellants continue to bear the burden of pleading and proving each of the [ineffective assistance of counsel] elements on appeal to this Court"). A petitioner's failure to satisfy any prong of this test is fatal to the claim. ***Cooper***, 941 A.2d at 664.
>
> When [an appellate c]ourt reviews an order dismissing or denying a PCRA petition, its standard of review is whether the findings of the PCRA court are supported by the record and are free from legal error. "The PCRA court's credibility determinations, when supported by the record, are binding on this Court[.]" ***Commonwealth v. Mason***, 634 Pa. 359, 130 A.3d 601, 617 (2015) (quoting ***Commonwealth v. Roney***, 622 Pa. 1, 79 A.3d 595, 603 (2013)). "Appellant has the burden to persuade this Court that the PCRA court erred and that such error requires relief." ***Commonwealth v. Wholaver***, 644 Pa. 386, 177 A.3d 136, 144-45 (2018).

***Commonwealth v. Reid***, 259 A.3d 395, 405–06 (Pa. 2021).

We are not persuaded that the PCRA court erred. Appellant "presents intertwined arguments" assailing trial counsel's failure to confer with Appellant before engaging in direct examination, sidebar and in-chambers communications, and failing to adequately advise Appellant "regarding the waiver" of his Fifth Amendment right, which "was implicated through Trial Counsel's own line of questioning, and in his reaction to the fallout from that line of questioning, as evidenced by the sidebar and during in chambers discussions." Appellant's Brief at 12. Appellant asserts trial counsel "unilaterally decided to waive [Appellant's] Fifth Amendment Rights—which trial counsel had no right to do." ***Id.*** at 16. Appellant claims trial counsel "elected a trial strategy which waived his right to remain silent without first consulting [Appellant] about his strategy, and without obtaining [Appellant's] consent to use this strategy." ***Id.*** at 17. According to Appellant, trial counsel

admitted his mistake at the PCRA hearing. *Id.* at 19. Appellant contends that when the issue regarding his Fifth Amendment right to remain silent "developed at trial, [trial counsel] did not discuss with [Appellant] what transpired at sidebar or in-chambers and did not consult with him about how he wished to proceed moving forward." *Id.* at 24. Appellant disputes the PCRA court's conclusion that Appellant waived his right to remain silent, and that trial counsel's questioning of Appellant, "was part of his reasonable strategy." *Id.* at 26-27. Appellant maintains trial counsel's actions were prejudicial and warrant a new trial. *Id.* at 28.

The record confirms Appellant waived his Fifth Amendment right to remain silent. Prior to Appellant testifying, trial counsel questioned Appellant:

> MR. COLAFELLA: Okay. Now, [Appellant], I have represented you since, well, I represented you in the last trial, is that correct, some time after your preliminary hearing I was appointed to your case; is that correct?
>
> THE DEFENDANT: Yes.
>
> MR. COLAFELLA: And I've continued to represent you through your appeal up until the present; is that correct?
>
> THE DEFENDANT: Correct.
>
> MR. COLAFELLA: Okay. [Appellant], we're obviously here in your second trial, and we are now in our case in chief, and we're at the point in the case where you have to make a decision as to whether you want to testify, and **you and I have discussed that issue at some length; is that correct**?
>
> THE DEFENDANT: Yes, correct.
>
> MR. COLAFELLA: And … in fact, [Appellant], you testified in the last trial; is that correct?
>
> THE DEFENDANT: Yes, I did.

- 10 -

MR. COLAFELLA: Okay. Have, **have you had ample opportunity to discuss with me your decision whether or not to testify**?

THE DEFENDANT: **Yes, I did**.

MR. COLAFELLA: And [Appellant], you understand that you would have the right under our Constitution and the Constitution of the United States that, if you choose, you have the right to refuse to testify, do you understand that?

THE DEFENDANT: Yes, I do.

MR. COLAFELLA: And that in the event you elected not to testify, the … Court would instruct the jury that they could draw no adverse inference from the fact that you did not testify on your behalf, do you understand that?

THE DEFENDANT: **Yes, I understand**.

MR. COLAFELLA: Now, naturally, if you do testify, you're subject to cross-examination, and there is an instruction that's given relative to the fact that you did, in fact, testify and the jury may weigh your credibility the same as any other witness, do you understand?

THE DEFENDANT: Yes.

MR. COLAFELLA: Based upon all of that, **based upon our discussions of your case and, and the defense in your case, is it your decision to testify[?]**.

THE DEFENDANT: Yes, it's my decision to testify.

MR. COLAFELLA: And in the event you do testify, **you understand, naturally, you are waiving your right to remain silent** and not testify in your own behalf, do you still understand?

THE DEFENDANT: Yes, I understand that.

MR. COLAFELLA: Okay. Do you have any questions at all in regard to those rights, [Appellant]?

THE DEFENDANT: No.

N.T., 2/28/17, at 118-221 (emphasis added). The trial court then determined "there's an adequate colloquy showing that [Appellant] has made a knowing, voluntary decision to testify. That record's now established." *Id.* at 221.

With respect to sidebars and in-chambers communication, Appellant testified on direct examination at the PCRA hearing as follows:

> Q. How many times do you think there might have been a side bar or an in-chamber discussion during your trial?
>
> A. A lot.
>
> Q. And when you say "a lot," would that be plus ten?
>
> A. Probably more than that, yeah.
>
> Q. More than 20?
>
> A. Yeah, probably more than 20.
>
> Q. Mr. Colafella said it was probably 20 or more, right?
>
> A. Yeah.
>
> Q. Would you agree with that?
>
> A. Yeah, I would agree with that.
>
> Q. And how many times were you able to participate in the side bar or the in-chambers meeting?
>
> A. Never.
>
> Q. How many times were you offered the opportunity to be part of that process?
>
> A. Never.
>
> Q. So what happened when they'd go in chambers, what happened with you?

A. I would go downstairs, and they would talk, and then they would bring me back up or they would go over and have a side bar, and that would be that.

Q. When was the first time that you learned, strike that. Were there times where you had learned what the discussions were in chambers?

A. When **my lawyer came out and told me what they w[ere], you know, speaking of**.

Q. And were there times where the [trial c]ourt would ask you questions on the record regarding the discussions that they had behind closed doors?

A. Yes.

N.T., 9/27/21, at 98-99 (emphasis added).

Trial counsel confirmed he asked Appellant the "question regarding the fact that he did not, unlike his codefendant [Tyrone Fuller], go running to the district attorney looking for some sort of deal[.]" *Id.* at 13. Appellant testified that Tyrone Fuller's trial testimony was "very crucial." *Id.* at 103. Nonetheless, Appellant stated that he was "thrown for a loop" when trial counsel asked Appellant whether he "went running to the DA's office." *Id.* at 106.

The Commonwealth emphasizes that Appellant's argument pertains not to his Fifth Amendment right to remain silent, but "whether trial counsel was ineffective for asking Appellant whether he 'went running to the DA's Office to cooperate.'" Commonwealth Brief at 5. The Commonwealth correctly observes that the PCRA court's analysis is "whether trial counsel's action was unreasonable and rendered his representation ineffective." *Id.* at 6.

- 13 -

It bears repeating that the "PCRA court's credibility findings are to be accorded great deference, and where supported by the record, such determinations are binding on a reviewing court." ***Commonwealth v. Treiber***, 21 A.3d 435, 444 (Pa. 2015) (citation omitted).

As to trial counsel's strategy:

> When assessing whether counsel had a reasonable basis for his act or omission, the question is not whether there were other courses of action that counsel could have taken, but whether counsel's decision had any basis reasonably designed to effectuate his client's interest ... this cannot be a hindsight evaluation of counsel's performance, but requires an examination of "whether counsel made an informed choice, which at the time the decision was made reasonably could have been considered to advance and protect [the] defendant's interests." Our evaluation of counsel's performance is "highly deferential."

***Commonwealth v. Williams***, 141 A.3d 440, 463 (Pa. 2016) (citations omitted).

Here, the PCRA court found "the question asked by [Appellant's] counsel was part of his reasonable trial strategy, and [Appellant] suffered no prejudice as a result." PCRA Court Opinion, 12/20/21, at 43-44. After explaining its rationale, ***id.*** at 44-46, the court continued:

> Even if the claim had arguable merit, the [c]ourt first finds that counsel's question was part of a reasonable trial strategy: to discredit the testimony of Tyrone Fuller and to contrast Fuller's behavior with [Appellant's]. Counsel explained:
>
> > You know, naturally, we're trying to drive the point home. We were, it was difficult because Fuller didn't testify, so, and Leo didn't testify, so we didn't have confederate testimony, co-confederate testimony in the second trial. So in an effort to really try to amplify that fact that all of these cooperatives were

- 14 -

> proactively seeking consideration and, you know, special consideration for their testimony and cooperation, I really wanted to drive that point home, [that] we weren't among those that, that had anything to hide or anything to prove, so, or anything to gain, so yeah, but obviously, I asked the question in the way that I did.
>
> [W]as I horribly bothered by it? No, because it was true [that Appellant] didn't go running to the District Attorney's Office like the other individuals asking for a deal, and I believe I presented to the jury in the context of, you know, he had nothing to contribute because he was not involved, and that was the implication.

N.T., PCRA Hearing, 9/27/2021, at 38, 50; *id.* at 57-59, 61-62 ([trial counsel] explaining the overall trial strategy of emphasizing Fuller's culpability), *id.* at 66 ([trial counsel] explaining that he asked the question "to amplify for the jury [Appellant's] steadfast position that he was not involved and wasn't about to take a deal unlike Mr. Fuller and admit to something he didn't do"), *id.* at 70, 73 (agreeing that asking the question was part of his trial strategy and that there was a tactical reason to ask it). Counsel's explanation for his strategy is consistent with his line of questioning at trial, where [Appellant] was asked numerous questions to distance and distinguish [Appellant] from Fuller, to contrast Fuller's motive with [Appellant's] lack of motive. *E.g.*, N.T. Trial, Vol. XII, 2/28/2017, at 260-68; N.T. Trial, Vol. XIII, 3/1/2017, at 17-18, 23-24, 29-38, 48-56, 66-75. Because [Appellant] testified, the Commonwealth could thus attempt to impeach [Appellant's] credibility by referring to his prearrest silence, and it is also part of a reasonable trial strategy to preemptively introduce this information on direct examination. *Cf. Commonwealth v. Pursell*, 555 Pa. 233, 268-69, 724 A.2d 293, 311 (1999) (finding a reasonable strategic basis to introduce a testifying defendant's *crimen falsi* convictions on direct examination).

*Id.* at 46-47.

The PCRA court further found:

> The reality is that the evidence of [Appellant's] guilt in this case was overwhelming[.] [Appellant] has been convicted by two unanimous juries, and there is no reason to think that his conviction was the result of his trial counsel's comparison of Tyrone Fuller's self-interested action in seeking a plea agreement with [Appellant's] continued assertion that he was not involved.

*Id.* at 48. The court concluded the testimony at the PCRA hearing "from both trial counsel and [Appellant] make it abundantly clear that, although the specific form of the question may not have been proposed to [Appellant] prior to its asking, the substance of the question was well in line with the general trial strategy contemplated by both trial counsel and [Appellant]." *Id.* at 50.

The record supports the PCRA court's determination that Appellant was not prejudiced, nor was trial counsel ineffective. The PCRA court's discussion of additional issues provides context for our disposition, and we specifically adopt the PCRA court's reasoning regarding the issues presented on appeal. *See* PCRA Court Opinion, 12/20/21, at 44-50. Accordingly, we adopt the PCRA court's December 20, 2021 opinion in affirming the denial of relief.

Order affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date:  09/12/2022

- 16 -

IN THE COURT OF COMMON PLEAS OF BEAVER COUNTY
PENNSYLVANIA
CRIMINAL DIVISION

COMMONWEALTH OF PENNSYLVANIA : NO. CP-04-CR-133-2013
:
V. :
:
MARLIN KELLY, :
:
DEFENDANT :

**TESLA, J.**                                              **JANUARY 13, 2022**

## Pa.R.A.P. 1925(a) Opinion

Defendant in the above-captioned case has appealed this Court's December 20, 2021 order denying his petition under the Post Conviction Relief Act (PCRA). The Court did not order Defendant to file a concise statement of errors complained of on appeal. The Court has explained its reasons for denying each and every one of Defendant's PCRA claims in its December 20, 2021 opinion, which is attached and incorporated by reference. The Superior Court's attention is respectfully directed thereto.

The Beaver County Clerk of Courts is directed to file the record of these proceedings with the Superior Court of Pennsylvania.

**BY THE COURT:**

_____

KIM TESLA
JUDGE

| Addressee | Start Time | Time | Prints | Result | Note |
|---|---|---|---|---|---|
| DIST ATTY | 01-13 09:28 | 00:00:19 | 001/001 | OK | |

Note  TMR:Timer TX, POL:Polling, ORG:Original Size Setting, FME:Frame Erase TX,
DPS:Page Separation, MIX:Mixed Original TX, CALL:Manual TX, CSHC:cShc,
FWD:Forward, PC:PC-FAX, DBD:Double-Sided Binding Direction, SP:Special Original,
FCODE:F-code, RTX:Re-TX, RLY:Relay, MBX:Confidential, BUL:Bulletin, SIP:SIP Fax,
IPADR:IP Address Fax, I-FAX:Internet Fax

Result  OK: Communication OK, S-OK: Stop Communication, PW-OFF: Power Switch OFF,
TEL: RX from TEL, NG: Other Error, Cont: Continue, No Ans: No Answer,
Refuse: Receipt Refused, Busy: Busy, M-Full:Memory Full, LOVR:Receiving length Over,
POVR:Receiving page Over, FIL:File Error, DC:Decode Error, MDN:MDN Response Error,
DSN:DSN Response Error, PRINT:Compulsory Memory Document Print,
DEL:Compulsory Memory Document Delete, SEND:Compulsory Memory Document Send.



IN THE COURT OF COMMON PLEAS OF BEAVER COUNTY
PENNSYLVANIA
CRIMINAL DIVISION

COMMONWEALTH OF PENNSYLVANIA : NO. CP-04-CR-133-2013
                     :
              V.          :
                     :
MARLIN KELLY,          :
                     :
      DEFENDANT        :

TESLA, J.                                             JANUARY 13, 2022

### Pa.R.A.P. 1925(a) Opinion

Defendant in the above-captioned case has appealed this Court's December 20, 2021

order denying his petition under the Post Conviction Relief Act (PCRA). The Court did not

order Defendant to file a concise statement of errors complained of on appeal. The Court has

explained its reasons for denying each and every one of Defendant's PCRA claims in its

December 20, 2021 opinion, which is attached and incorporated by reference. The Superior

Court's attention is respectfully directed thereto.

The Beaver County Clerk of Courts is directed to file the record of these proceedings

with the Superior Court of Pennsylvania.

BY THE COURT:

KIM TESLA
JUDGE

IN THE COURT OF COMMON PLEAS OF BEAVER COUNTY
PENNSYLVANIA
CRIMINAL DIVISION

COMMONWEALTH OF PENNSYLVANIA  :  NO. CP-04-CR-133-2013
                                                           :
                      V.                                   :
                                                           :
MARLIN KELLY,                                              :
                                                           :
         DEFENDANT                                         :

**TESLA, J.**                                              **DECEMBER 20, 2021**

# OPINION

## I. INTRODUCTION

Defendant was convicted after a jury trial of one count of second degree murder, one count

of second degree murder of an unborn child, and one count of conspiracy to commit robbery.

Defendant was sentenced to the mandatory minimum sentence of life imprisonment. On direct

appeal, the Superior Court affirmed the convictions. The Supreme Court then declined to grant

Defendant's request for *allocatur*. Defendant now requests post-conviction collateral relief, raising

eighteen separate issues. For the reasons stated in this Opinion, Defendant's issues are contrary to

the record and without any merit. Because Defendant's issues are without merit, his request for

post-conviction collateral relief is denied.

## II. FACTS AND PROCEDURAL HISTORY

The facts and procedural history of this case are presented in great detail in the Court's

Opinion entered on October 25, 2017. Due to the numerous issues raised by Defendant and the

gravity of this case, and for the convenience of any person reviewing this case, the Court will again

reproduce here the facts and procedural history previously provided.

This case was first tried in August of 2014. The jury returned a verdict on August 26, 2014, finding Defendant guilty of one count of second degree murder, one count of second degree murder of an unborn child, and one count of conspiracy to commit robbery. The jury found Defendant not guilty of one count of robbery. A sentencing hearing was held on September 26, 2014. At the sentencing hearing, Defendant was sentenced to serve the mandatory sentence of life imprisonment on the count of second degree murder, the mandatory sentence of life imprisonment on the count of second degree murder of an unborn child, and a sentence of eight to twenty years on the count of conspiracy to commit robbery, all sentences to run concurrently.

On September 29, 2014, Defendant filed a Motion for Post-Sentence Relief, claiming that the evidence was insufficient to support his convictions, that the verdict was against the weight of the evidence, and that the Court erred in refusing to excuse for cause three specific jurors. On February 6, 2015, argument was heard from defense counsel and the Commonwealth on Defendant's Motion for Post-Sentence Relief. On February 9, 2015, the Court entered an Order denying Defendant's Motion for Post-Sentence Relief. Defendant filed a Notice of Appeal on February 24, 2015.

On February 8, 2016, the Superior Court reversed Defendant's conviction and remanded this case for a new trial based upon this Court's denial in jury selection of one of Defendant's challenges for cause. Commonwealth v. Kelly, 134 A.3d 59 (Pa. Super. 2016). The Commonwealth filed an Application for Reargument with the Superior Court, which was denied on April 11, 2016. The Commonwealth then filed a Petition for Allowance of Appeal with the Supreme Court, which was denied on September 27, 2016. On October 20, 2016, the appeal process having concluded and the case having been remanded, the Court entered an Order scheduling Defendant's new trial.

Jury selection in Defendant's new trial commenced on February 13, 2017 and the trial began February 15, 2017. Defendant was tried at his new trial on charges of second degree murder, second degree murder of an unborn child, and conspiracy to commit robbery. The testimony and other evidence presented at the second trial was substantially the same as what was presented at the first trial. The former testimony of James Leo from the first trial was admitted at the second trial because James Leo was deceased at the time of the second trial. Additionally, the former testimony of Tyrone Fuller from the first trial was admitted at the second trial because he refused to testify at Defendant's second trial.

. . . [T]he Court provides the following detailed narrative of the facts. Conekia Finney, known to her family and friends as "Coco," lived with her fiancé, Stephen Murray, in an apartment on Merchant Street in Ambridge, Pennsylvania. Stephen Murray was a heroine dealer whose street name was "Smoke." At the time, Conekia had been dating Stephen for about a year and was seven months pregnant with the couple's unborn daughter, Sekiah. In the evening on October 28, 2012, Conekia called her mother, Elaine Finney, to come and pick her up from the

2

couple's apartment so that she could get some food. Elaine arrived and parked her car across the street from the apartment before honking the horn. Stephen gave Conekia three dollars to pay for gas. Conekia, who was wearing Stephen's hoodie, said goodbye to Stephen's brother, Herbert Murray, who was also a heroine dealer and went by the name "Caboose." As Conekia opened the door to leave the apartment, a gunman fired a single shot from a black Springfield Armory XD .45 caliber handgun through the open doorway, striking Conekia in the chest. Stephen and Herbert called 911. Stephen and Herbert could be heard yelling on the recording of the 911 call and stating that it was "Twin," the street name for Defendant, and "Diego," the street name for Tyrone Fuller. N.T. 2/15/17, at 148. Although first responders attempted to provide first aid at the scene, Conekia died as a result of the gunshot wound, and her unborn child Sekiah died as a result of Conekia's death.

Leading up to the homicides, Tyrone Fuller and Defendant had been selling heroin out of the house of Dana Camp and Bradley LaVelle, on Park Road in Ambridge. Stephen and his other brother Juan Murray, whose street name was "Fats," had at one time also sold drugs at Camp's house. At one point, prior to the homicides, a meeting was held in Camp's home at which it was decided that Stephen was to be excluded from selling drugs there. Additionally, Juan had at times also been excluded from selling drugs there as punishment for allowing heroin addicts to be there.

Defendant knew Juan from school growing up. Juan and Defendant purchased bags of heroin from a cousin of Juan's known as "Days." These bags of heroine were each stamped with the words, "411 Gangster." Juan held some of Defendant's heroin from that purchase at his house. In the week or two leading up to the homicides, Juan's paramour, Gigi, contacted the police regarding a domestic violence incident, which resulted in Juan being arrested. Defendant and Fuller came to Juan's home to recover the heroin kept there, but found that it was missing. Herbert had already taken the bags of heroin stamped with "411 Gangster" to Stephen's house. Juan testified that he called Defendant and Fuller while he was in jail, and that Fuller sounded "pissed," and that Defendant sounded "peeved." N.T. 2/27/17, at 160, 115-16, 233-34.

During the investigation, the Ambridge Police recovered the black Springfield Armory XD .45 caliber handgun which was used to murder Conekia Finney. Frank Brendle, Jr., a heroin addict, had previously stolen the gun from Robert Schultz and sold it to Fuller in exchange for heroin. Fuller's testimony was that Defendant was insistent on buying the Springfield Armory XD .45 caliber handgun from him, that Defendant kept asking, that Fuller sold it to Defendant, and that Defendant had the weapon at the time of the murder. Cmwlth. Ex. 144 (N.T. 8/19/14, at 39-44; N.T. 8/21/14, at 121-22, 140-41). The Commonwealth presented a number of photographs taken by Defendant on his cellphone that portrayed Defendant in possession of the murder weapon. Juan Murray also testified that Defendant was excited about the gun, that Defendant purchased it from Fuller, and

3

that Defendant had it several days before Juan was arrested because of the domestic dispute. N.T. 2/27/17, at 144-46, 239-40.

On October 28, 2012, the day of the homicides, Fuller contacted Defendant and asked him to come over to Camp's home. Defendant was eventually driven from Pittsburgh by his wife to meet Fuller at Camp's home in Ambridge. When Defendant arrived, Fuller was complaining about Stephen Murray "stepping on his toes," and otherwise interfering with his drug business. Leaving Dana Camp and Brad LaVelle downstairs, Fuller and Defendant went to an upstairs bedroom to discuss the situation.

Fuller's testimony was that an understanding was reached that they would "check" Stephen Murray, meaning they would assault and rob him if he had anything. Cmwlth. Ex. 144 (N.T. 8/19/14, at 120-26). Fuller said that Defendant agreed with the plan to assault and rob Stephen. Dana Camp testified that she could hear voices talking upstairs. She further testified that, although she could not hear what they said upstairs, after they came downstairs, Defendant agreed with Fuller that something needed to be done about Stephen Murray. N.T. 2/16/17, at 121-125. Following their discussion in the upstairs room, James Leo, a heroin addict who performed driving services for Fuller and Defendant in exchange for heroin, was called. Fuller asked Leo to show them where Stephen Murray lived, and in exchange Fuller would give him money to buy heroin from Stephen which Leo could then keep. After pointing out the apartment to them, Leo then drove them to Maplewood Avenue. Fuller then had Leo make a call to Stephen to purchase heroin. Fuller had Leo place the phone on speaker so that everyone in the car, Leo, Fuller, and Defendant, could hear. Cmwlth. Ex. 143 (N.T. 8/15/14, at 45-49); Cmwlth. Ex. 144 (N.T. 8/19/14, at 133-36). After the call was made, Fuller and Defendant exited the car. Leo's testimony was that Fuller said they were going to "beat" Stephen, which Leo believed meant they were going to rob him. Cmwlth. Ex. 143 (N.T. 8/15/14, at 50, 155-65).

Leo went to purchase the heroin from Herbert. The paper bags containing the heroin were each stamped with the words, "411 Gangster," the same label that was stamped on the heroin bags which had been purchased earlier by Defendant, which had been left at Juan's home, and which were later taken by Herbert. Fuller's testimony was that he and Defendant walked down the street and hid on the porch of a house on the way to Stephen's apartment, planning to take Stephen Murray by surprise. Cmwlth. Ex. 144 (N.T. 8/19/14, at 137-38, 143-44). After waiting some time, the two then approached Stephen's apartment itself.

Stephen's apartment was on the second story of an apartment building, which was immediately adjacent to another apartment building. A single narrow flight of stairs ran up between the two buildings. Stephen's apartment could be accessed either by descending those stairs from above the apartment, or by ascending those stairs from below the apartment. After approaching the apartment, Fuller said that the two tried to look inside through the window, but could not see past the blinds or curtains, and so they waited behind a corner near the top of the

4

stairway leading down to the apartment. After waiting for a period of time the two headed down the stairs toward the front of the apartment building, intending to leave because no one arrived.

Upon reaching the foot of the stairs, however, they heard someone enter the apartment from the top of the stairs. Fuller's testimony was that Defendant then ran up the stairs toward the apartment, with Fuller following. Fuller stated that Defendant slipped on the wooden landing in front of the apartment door because it had been raining, and that simultaneously as Defendant tried to stand back up, the door opened and Defendant lifted the Springfield Armory XD .45 caliber handgun and fired into the doorway. Cmwlth. Ex. 144 (N.T. 8/19/14, at 165-67; N.T. 8/21/14, at 20-21).

Defendant then ran past Fuller off the landing and down the stairs, and Fuller followed. When Fuller asked him what happened, Defendant replied, "I think he checked," and "I could tell by the way he fell," which Fuller understood to mean that Defendant had killed someone inside. Cmwlth. Ex. 144 (N.T. 8/19/14, at 167-69, 186-87; N.T. 8/21/14, at 25-26). Fuller then testified that they ran back toward Camp's home and that on the way they removed the magazines from the handguns which they were carrying. They each threw the handguns and magazines over a fence and into a tow yard. Elaine Finney testified that, after hearing a loud bang which she believed at the time to be a door slamming, she saw what she thought were two children, because of the way they were running, come down the stairs and run across Merchant Street. They were each wearing black hoodies. She described one hoodie as having a white emblem in the middle, which the evidence later showed had been worn by Defendant. N.T. 2/15/17, at 238; Cmwlth. Ex. 37.

Defendant and Fuller arrived at Camp's home. Leo then arrived after them. Leo drove them toward Pittsburgh, and they stopped for fuel at a BP gas station. Fuller gave Leo twenty dollars to buy gas, and Defendant told his wife over the phone to pick them up at the McDonald's in Bellevue. Upon arriving at the McDonald's, Fuller and Defendant got in Defendant's wife's blue Dodge Magnum van, and they all drove to a bar. Defendant then left the bar with his wife and Fuller called someone to pick him up. Following an investigation by Chief Mann and the Ambridge Police Department, Fuller and Defendant were apprehended three days later on October 31, 2012. Fuller was arrested in Monessen and Defendant was arrested in Turtle Creek.

Defendant's second trial concluded on March 6, 2017, when the jury returned a verdict of guilty on one count of second degree murder, one count of second degree murder of an unborn child, and one count of conspiracy to commit robbery. On April 20, 2017, the Court again sentenced Defendant to serve the mandatory sentence of life imprisonment on the count of second degree murder, the mandatory sentence of life imprisonment on the count of second degree murder of an unborn child, and a sentence of eight to twenty years on the count of conspiracy to commit robbery, all sentences to run concurrently.

5

Rule 1925(a) Opinion, 10/25/2017, at 1-8 (footnotes omitted).

After Defendant was convicted and sentenced following his second trial, he filed a Motion for Post-Sentence Relief, challenging the weight and sufficiency of the evidence. The Court denied Defendant's Motion. Defendant filed a Notice of Appeal on September 7, 2017. On May 17, 2018, the Superior Court affirmed Defendant's convictions, concluding that the evidence was sufficient and that the jury's verdict was not against the weight of the evidence. Commonwealth v. Kelly, No. 1301 WDA 2017, 2018 WL 2250768 (Pa.Super. May 17, 2018) (memorandum). On June 18, 2018, Defendant filed a Petition for Allowance of Appeal. On November 15, 2018, the Supreme Court entered a *per curiam* Order denying Defendant's Petition.

On August 5, 2019, Defendant filed *pro se* a Motion for Post Conviction Collateral Relief (hereinafter, "PCRA Petition"). In his PCRA petition, Defendant raised eleven issues. The Court entered an Order appointing counsel after a preliminary review of the issues raised by Defendant. On December 23, 2019, Defendant's counsel filed an Amendment to Pro Se Motion for Post Conviction Collateral Relief and Motion to Schedule Hearing (hereinafter, "First Amended PCRA Petition"). The Amended PCRA Petition preserved Defendant's eleven *pro se* issues and raised three more, for a total of fourteen separate issues. On February 24, 2020, the Commonwealth filed an Answer, opposing Defendant's requested relief. This case then experienced some delays as a result of the COVID-19 pandemic.[1]

Defendant's first appointed counsel ultimately withdrew from representation after obtaining employment with the Public Defender's office. The Court then appointed current PCRA

---

[1] For example, a pretrial conference scheduled for March 25, 2020 was canceled as a result of the COVID-19 pandemic in accordance with the Supreme Court of Pennsylvania's *per curiam* Order declaring a statewide judicial emergency. In re: General Statewide Judicial Emergency, Nos. 531 and 532 Judicial Administrative Docket (Pa. Mar. 18, 2020) (*Per Curiam* Order).

counsel. On September 15, 2021, current counsel then filed a Second Amended Motion for Post Conviction Collateral Relief (hereinafter, "Second Amended PCRA Petition"). The Second Amended PCRA Petition retained Defendant's eleven *pro se* issues, retained prior PCRA counsel's additional three issues, and raised four more issues, for a total of eighteen separate claims of ineffective assistance of counsel asserted in this PCRA proceeding.

The Court held an evidentiary hearing on September 27, 2021. At the hearing, the Court heard testimony from Defendant's trial counsel and from Defendant himself. The Court entered an order directing a briefing schedule. Defendant filed his brief on November 29, 2021. At a telephone conference with counsel, the Court directed the Commonwealth to file its brief no later than December 27, 2021. Based on thorough review of the record of the trial and PCRA hearing in this case, as well as the well-developed arguments of Defendant in his brief, the Court finds that there is a sufficient record to enter an opinion prior to the filing of the Commonwealth's brief.

After a careful review of the issues raised, the extensive record in this case, the testimony heard at the PCRA hearing, and the arguments of counsel, the Court concludes that each of Defendant's issues are contrary to the record and devoid of any merit. Because each of Defendant's claims are framed as claims of ineffective assistance of counsel, the Court will first consider the law that applies to such claims. The Court will then address each of Defendant's specific issues in turn, beginning with the eleven issues originally raised by Defendant in his *pro se* PCRA Petition, turning next to the three additional issues raised in Defendant's First Amended PCRA Petition, and finally addressing the four additional issues raised in Defendant's Second Amended PCRA Petition.

## III. ANALYSIS

### A. To prove ineffective assistance of counsel, a defendant must plead and prove by a preponderance of the evidence that his claim is of arguable merit, that his counsel had no reasonable strategic basis for his action or inaction, and that he was prejudiced as a result.

Each of Defendant's eighteen claims assert that his trial counsel was ineffective. Before addressing each individual claim, the Court reviews the applicable law concerning claims of ineffective assistance of counsel.

A defendant has the burden of pleading and proving by a preponderance of the evidence that the claims he is asserting are eligible for relief under the Post Conviction Relief Act. 42 Pa.C.S. § 9543. The Act states that a defendant must plead and prove "[i]neffective assistance of counsel which, in the circumstances of the particular case, so undermined the truth-determining process that no reliable adjudication of guilt or innocence could have taken place." 42 Pa.C.S. § 9543(a)(2)(ii). The statutory standard under the Act has been held to be synonymous with the constitutional standard for ineffective assistance of counsel. Commonwealth v. Kimball, 555 Pa. 299, 310–13, 724 A.2d 326, 331–33 (1999). Accord, e.g., Commonwealth v. Bickerstaff, 204 A.3d 988, 992–93 (Pa.Super. 2019).

> It is well established that counsel is presumed to have rendered effective assistance. *Commonwealth v. Sepulveda*, 618 Pa. 262, 55 A.3d 1108, 1117 (2012). To obtain relief on a claim challenging counsel's performance, a PCRA petitioner must satisfy the performance and prejudice test announced in *Strickland v. Washington*, 466 U.S. 668, 687, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). In Pennsylvania, we apply the *Strickland* test by examining whether: (1) the underlying claim has arguable merit; (2) counsel lacked a reasonable basis for his actions or failure to act; and (3) the petitioner was prejudiced by counsel's deficient performance such that there is a reasonable probability that the result of the proceeding would have been different absent counsel's error or omission. *Commonwealth v. Pierce*, 515 Pa. 153, 527 A.2d 973, 975 (1987).
>
> A petitioner's failure to satisfy any prong of the ineffectiveness test is fatal to the claim. *Commonwealth v. Wholaver*, 644 Pa. 386, 177 A.3d 136, 144 (2018). We

8

are not required to analyze the elements of an ineffectiveness claim in any particular order; if a claim fails under any prong of the ineffectiveness test, the Court may proceed to that element first. *Sepulveda*, 55 A.3d at 1117-18. Moreover, counsel cannot be deemed ineffective for failing to raise a meritless claim. *Commonwealth v. Treiber*, 632 Pa. 449, 121 A.3d 435, 445 (2015).

Commonwealth v. Montalvo, 205 A.3d 274, 286 (Pa. 2019).

Thus, counsel is presumed to be effective and a defendant must plead and prove by a preponderance of the evidence: (1) that his claim regarding counsel's failure has arguable merit, (2) that counsel had no reasonable basis for the failure, and (3) prejudice as a result. Id. All three elements must be pled and proven, and the failure to plead or prove any element results in the failure of the claim. Id. The Court next addresses *seriatim* each of Defendant's specific claims of ineffective assistance of trial counsel.

## B. Defendant's counsel was not ineffective for not requesting a jury instruction concerning accomplice testimony.

First, Defendant claims that his counsel was ineffective for failing to request a "corrupt and polluted source" jury instruction. That is, Defendant claims that the Court failed to instruct the jury concerning accomplice testimony. See, e.g., Commonwealth v. Wholaver, 177 A.3d 136, 165 (Pa. 2018).

> [A]n instruction is required when an accomplice's testimony implicates the defendant; the instruction informs the jury "that the accomplice is a corrupt and polluted source whose testimony should be viewed with great caution." *Commonwealth v. Smith*, 609 Pa. 605, 17 A.3d 873, 906 (2011) (quoting *Commonwealth v. Chmiel*, 536 Pa. 244, 639 A.2d 9, 13 (1994)). This instruction is necessary if the trial evidence is sufficient to present an inference that a Commonwealth witness was an accomplice. *Smith*, 17 A.3d at 906.

Id.

It is true, as Defendant claims, that the Court is generally required to give a cautionary instruction where an accomplice's testimony implicates the defendant on trial. But see id. at 166

9

(defendant not prejudiced by trial court's failure to give required polluted source instruction). In the present case, however, the record plainly shows that the Court did indeed give such an instruction. N.T., Trial, Vol. XIV, 3/2/17, at 154-56.

> Now, I've just provided you an instruction explaining what an accomplice is. When a Commonwealth witness is an accomplice, his testimony has to be judged by special precautionary rules. Experience shows us that an accomplice when caught may often try to place blame falsely on someone else. He may testify falsely in hope of obtaining favorable treatment or some other corrupt or wicked motive.
>
> On the other hand an accomplice may be a perfectly truthful witness.
>
> The special rules that I will give you are meant to help you distinguish between a truthful and false accomplice testimony.
>
> In view of the evidence of Tyrone Fuller's criminal involvement, you must regard him as an accomplice in the crime charged and apply the special rules to his testimony.
>
> Again, an accomplice is a person who knowingly and voluntarily cooperates with or aides another in the commission of a crime.
>
> These are the special rules that apply to accomplice testimony.
>
> *First, you should view the testimony of an accomplice with disfavor because it comes from a corrupt and polluted source.*
>
> Second, you should examine the testimony of an accomplice closely and accept it only with care and caution.
>
> Third, you should consider whether the testimony of an accomplice is supported in whole or in part by other evidence.
>
> Accomplice testimony is more dependable if it's supported by independent evidence. However, even if there is no independent supporting evidence, you may still find the Defendant guilty solely on the basis of an accomplice testimony if after using the special rules I just told you about you are satisfied beyond a reasonable doubt that the accomplice testified truthfully and the Defendant is guilty.

Id. (emphasis added).

A reading of the transcript shows that the Court gave precisely the instruction Defendant complains was not given. Defendant's claim is clearly contrary to the record, and he has failed to

10

prove that his claim is even of arguable merit. His counsel was therefore not ineffective. Because his counsel was not ineffective, Defendant's claim has no merit and is denied.

## C. Defendant's counsel was not ineffective for not requesting a jury instruction concerning mere presence of an alleged accomplice.

Second, Defendant claims that his counsel was ineffective for failing to request a "mere presence" jury instruction. That is, Defendant claims that the Court failed to give an instruction that a person cannot be found to be an accomplice merely because he is present at the scene and has knowledge of the incident. See, e.g., Commonwealth v. Henderson, 249 Pa.Super. 472, 487, 378 A.2d 393, 400 (Pa.Super. 1977) ("We, therefore, hold that it was reversible error for the court to refuse appellant's tendered instruction that mere presence and knowledge of the commission of the offense without some evidence of an agreement to solicit, aid, or promote its commission would be insufficient to find appellant guilty of being an accomplice or conspirator.")

Again, however, Defendant's claim is contradicted by the record. As with the corrupt and polluted source instruction, the Court also instructed the jury that mere presence at the scene does not mean that a person is an accomplice. N.T., Trial, Vol. XIV, 3/2/17, at 154.

> *It is important to understand that a person is not an accomplice merely because he is present when the crime is committed or knows that the crime is being committed.*
>
> A person is an accomplice, a person who is an accomplice will not be responsible for the crime if, and only if, the person before the other person commits the crime either stops his own efforts to promote or facilitate the commission of the crime and either wholly deprives his previous efforts of effectiveness in the commission of the crime or gives timely warning to the law enforcement authorities or otherwise makes a proper effort to prevent commission of the crime.

Id. (emphasis added).

The transcript shows that the Court clearly informed the jury that mere presence alone does not render a person an accomplice. Defendant's claim is therefore contrary to the record, and he

11

again fails to demonstrate even arguable merit. His counsel was therefore not ineffective. Because his counsel was not ineffective, Defendant's claim has no merit and is denied.

## D. Defendant's counsel was not ineffective for not requesting an alibi instruction.

Third, Defendant claims that his counsel was ineffective for failing to request an alibi instruction. Defendant asserts that that his counsel presented an alibi defense, and that his counsel was ineffective for not requesting a jury instruction concerning alibi. Again, Defendant's claims are belied by the record.

A defendant has the burden of notifying the prosecution of its intent to present an alibi defense. Pa.R.Crim.P. 567. Accord Commonwealth v. Poindexter, 435 Pa.Super. 509, 525, 646 A.2d 1211, 1218 (1994) ("The right to present evidence of an alibi and to receive a jury instruction therefrom, however, is not absolute. In order to obtain this right, a defendant must comply with the notice requirement set forth in . . . the Pennsylvania Rules of Criminal Procedure."). In this case, a notice of alibi defense was never filed.[2]

Additionally, for a defendant to be entitled to request an alibi instruction, some evidence must have been submitted at trial to support the instruction. E.g., Commonwealth v. Kolenda, 544 Pa. 426, 432–34, 676 A.2d 1187, 1190–91 (1996) (evidence that the defendant "was one floor below the crime scene, does not render it *physically impossible* for him to have committed the crimes" and "merely testified that he did not enter the second floor apartment and did not attack [the victim]" did "not constitute an alibi but [were] a mere denial of guilt.") (emphasis in original).

Even considering Defendant's own testimony, no facts were ever presented that would support "a defense that [would] place[] the [D]efendant at the relevant time in a different place

---

[2] Defendant has never claimed that his counsel was ineffective for failing to file a notice of alibi.

than the scene involved and so removed therefrom as to render it impossible for him to be the guilty party." Id. at 431, 676 A.2d at 1190. Rather, Defendant testified that he was half-way up the steps outside the apartment when his co-conspirator shot and killed the victims. N.T., Trial, Vol. XIII, 3/1/17, at 53-54. Defendant's own testimony placed him directly at the crime scene at the time the crimes occurred. Indeed, he admitted to fleeing the scene with Tyrone Fuller immediately after the shooting. N.T., Trial, Vol. XIII, 3/1/17, at 54-55. Providing an alibi instruction based upon these facts and circumstances would have been not only improper, because an alibi defense does not apply to such facts, but would have created a great risk of misleading the jury.

Even if Defendant had not been present at the crime scene, an instruction concerning alibi would have been inapposite based upon the charges he was facing. Defendant was charged with felony murder and conspiracy to commit robbery. Neither of those charges require a defendant to be physically present at the crime scene when the crime occurs in order to be held criminally liable. Rather, the defendant may be held vicariously liable for the criminal acts of his accomplice and co-conspirator. 18 Pa.C.S. § 306 (concerning liability of accomplices); 18 Pa.C.S. § 903 (concerning liability of conspirators); Commonwealth v. Murphy, 577 Pa. 275, 292, 844 A.2d 1228, 1238 (2004) ("Once the trier of fact finds that there was an agreement and the defendant intentionally entered into the agreement, that defendant may be liable for the overt acts committed in furtherance of the conspiracy regardless of which co-conspirator committed the act."). In this case, the jury had the ability to find Defendant guilty whether he, or his accomplice Tyrone Fuller, was the principal who shot and killed the victims. The jury was equally able to find Defendant guilty as a conspirator to robbery based upon the testimony given at trial regarding Defendant's agreement to a conspiracy to commit robbery, and Tyrone Fuller's subsequent actions to effectuate that robbery.

13

Furthermore, Defendant has not demonstrated any prejudice. Rather, he plainly benefited from not asserting an alibi defense or requesting an alibi instruction. The Commonwealth requested an instruction that the jury should take an adverse inference against Defendant because of his failure to produce a witness who he testified to being with on the night of murders; the Court denied the Commonwealth's request based upon defense counsel's argument that alibi was not at issue. N.T., Trial, Vol. XIII, 3/1/17, at 248-265 (Defendant's attorney opposing the requested adverse inference instruction, advising the Court that he was not arguing that Defendant was somewhere else at the time the crime was committed, and advising the Court that he was not requesting an alibi instruction); N.T., Trial, Vol. XIV, 3/2/17, at 3-7 (Court ruling that it would not give the adverse inference instruction requested by the Commonwealth because alibi was not at issue).

Accordingly, the record makes plain that no alibi instruction would have been proper under the facts and circumstances of this case, and Defendant has failed to prove that his claim has arguable merit or that he has been prejudiced. Defendant's attorney argued *against* alibi in order to prevent an adverse inference instruction against Defendant based upon his failure to produce a witness. The Court ruled, based on counsel's argument, that it would not give the adverse inference instruction. Defendant has therefore also failed to prove that his counsel did not have a reasonable strategic basis for his actions. In short, Defendant has failed to prove that his counsel was ineffective. Because his counsel was not ineffective, Defendant's claim has no merit and is denied.

## E. Defendant's counsel was not ineffective for not objecting to the prosecution's statement concerning the length of Tyrone Fuller's sentence.

Fourth, Defendant claims that his counsel was ineffective for failing to object to allegedly improper statements by the prosecution. Specifically, Defendant claims that the assistant district

14

attorney misstated Tyrone Fuller's sentence as being thirty years of imprisonment, and claims that his co-conspirator's sentence was really thirteen to twenty-six years followed by four years of probation. Defendant asserts this statement was intended to cause the jury to impose a harsher sentence on himself. Defendant's claim is again without any support in the record. Defendant's co-conspirator, Tyrone Fuller, *was* sentenced to serve a minimum term of imprisonment of thirteen years, and a maximum term of imprisonment of thirty years. Commonwealth v. Fuller, No. CP-04-CR-134-2013, (Sep. 24, 2014) (sentence order). Thus, the assistant district attorney's statements were correct, and Defendant's claim is incorrect.

Additionally, the Court notes that a jury does not impose sentence other than in a death penalty case. Rather, the Court is charged with the solemn obligation of imposing an individualized sentence in a non-capital case. "[F]irst degree murder is the only crime for which the General Assembly has allowed the jury to impose a sentence." Commonwealth v. Baker, 531 Pa. 541, 575, 614 A.2d 663, 680 (1992). See also Pennsylvania Suggested Standard Criminal Jury Instructions, § 2.08 (2016) ("Do not concern yourself with what the penalty might be if you should find the defendant guilty. The question of guilt and punishment are separate questions. If you do find the defendant guilty, it will become my responsibility as judge to fix the penalty."). Thus Defendant could not have been prejudiced as he asserts because the jury was never in a position to impose sentence.

Defendant's claim again is contrary to the record. Defendant has failed to prove that his claim has any arguable merit. His counsel was therefore not effective. Because his counsel was not ineffective, Defendant's claim has no merit and is denied.

### F. Defendant's counsel was not ineffective for not objecting to the prosecution's presentation of evidence.

15

Fifth, Defendant claims that his counsel was ineffective for failing to object to other allegedly improper statements by the prosecution. Specifically, Defendant claims that the prosecution read only a portion of the statement of James Leo instead of his entire testimony. In essence, Defendant is claiming that his counsel should have objected to the manner in which the Commonwealth presented its evidence. The parties necessarily have some discretion, however, in the manner in which they decide to present their evidence. "Attaining the system's goal of accurately determining guilt or innocence requires that both the prosecution and the defense have wide discretion in the conduct of the trial and the presentation of evidence." Imbler v. Pachtman, 424 U.S. 409, 426, 96 S.Ct. 984, 993 (1976). See also Commonwealth v. Barnett, 50 A.3d 176, 190 (Pa.Super. 2012) (quoting Commonwealth v. Hickman, 453 Pa. 427, 432, 309 A.2d 564, 567 (1973) (stating that the Pennsylvania Supreme Court has "repeatedly held that the order of presentation of evidence is a matter which is largely within the discretion of the trial judge.").

While Defendant claims that the prosecution read only a portion of James Leo's statement, there is no requirement that the prosecution read an entire statement to the jury verbatim. Regardless, the jury in this case *did* hear James Leo's entire prior recorded testimony verbatim. N.T., Trial Vol. VI, 2/16/17; N.T., Trial Vol. VII, 2/17/17.

Defendant claims that the testimony of the witness, James Leo, was "rife with conjecture and mere surmise." Yet Defendant fails to identify a single solitary portion of the testimony where this is alleged to have occurred. Defendant's claim sounds in the nature of a claim against James Leo's credibility. Such a claim is a challenge to the weight of the evidence. Commonwealth v. Palo, 24 A.3d 1050, 1055 (Pa.Super. 2011) ("Directed entirely to the credibility of the Commonwealth's chief witness, Appellant's claim challenges the weight, not the sufficiency, of the evidence.").

Defendant's counsel did challenge both the weight and sufficiency of the evidence on direct appeal before the Superior Court, and both challenges were rejected by that Court and therefore have been previously litigated. Thus he cannot be ineffective when he raised a challenge to the weight and sufficiency of the evidence, and the evidence has been definitively held to have been sufficient. In essence, Defendant is seeking to re-challenge these claims by framing them as claims of ineffective assistance of counsel. A defendant cannot relitigate issues that have already been decided, however. 42 Pa.C.S. § 9543(a)(3) ("To be eligible for relief under this subchapter, the petitioner must plead and prove by a preponderance of the evidence . . . [t]hat the allegation of error has not been previously litigated or waived.").[3]

Defendant fails to prove that his claim has any arguable merit. The jury heard James Leo's entire testimony verbatim and the issue of the weight of the evidence was previously litigated on direct appeal. Defendant further fails to identify in what way he has been prejudiced. Defendant therefore fails to show that his counsel was ineffective. Because his counsel was not ineffective, Defendant's claim has no merit and is denied.

## G. Defendant's counsel was not ineffective for not objecting to the prosecution's cross-examination of Brad LaVelle.

Sixth, Defendant claims that his counsel was ineffective for failing to object to the prosecution's questioning of Brad LaVelle. Defendant claims the assistant district attorney "continuously engaged in acts of physical intimidation, yelling, and otherwise menacing behavior." Defendant complains that Mr. LaVelle "was intimidated into saying he doesn't know about firearms" after previously testifying that he saw Defendant with a small gray nine millimeter firearm.

---

[3] Indeed, a challenge to the weight of the evidence standing alone is not even a cognizable claim under the Post Conviction Relief Act. 42 Pa.C.S. § 9543(a)(2) (describing the types of claims for which relief may be granted).

17

The law places limitations on the conduct of a prosecutor, particularly where the conduct "is designed to provoke a mistrial in order to secure a second, perhaps more favorable, opportunity to convict the defendant," or where it is "undertaken in bad faith to prejudice or harass the defendant." Commonwealth v. Virtu, 495 Pa. 59, 65, n. 7 (Pa. 1981) (quoting Commonwealth v. Starks, 490 Pa. 336, 341, 416 A.2d 498, 500 (1980)). It has often been quoted that a district attorney "may prosecute with earnestness and vigor — indeed, he should do so. But, while he may strike hard blows, he is not at liberty to strike foul ones." Berger v. United States, 295 U.S. 78, 88, 55 S.Ct. 629, 633, 79 L.Ed. 1314 (1935). Defendant's claim of such improper conduct in this case, however, lacks any factual support.

The Court presided over this case at trial, and did not at any time observe anything from the assistant district attorney which could reasonably be characterized as physical intimidation, yelling, or menacing behavior. There is nothing in the record that reflects anything of the sort. N.T., Trial Vol. XII, 2/28/17, at 197-205, 211-213. Rather, the assistant district attorney's very first question on cross-examination was, "Good afternoon, Brad. How are you?" Id. at 197-98. Mr. LaVelle responded, "Good." Id. at 198. The assistant district attorney then asked, "Brad, you, you never saw [Defendant] with a 9.mm that night, did you?" Id. Mr. LaVelle answered, "No, not that night." Id. Several questions later, the assistant district attorney asked, "You don't know a lot about guns?" Id. Mr. LaVelle testified, "No." Id.

Simply stated, there is nothing in the record that remotely supports Defendant's claim of menacing or intimidating behavior. As with his other claims, Defendant's claim in this instance is again without any support from the record. He fails to demonstrate a claim of arguable merit, and fails to establish any form of prejudice. There was nothing objectionable in the Commonwealth's

18

questions, and counsel was not ineffective for choosing not to object. Because his counsel was not ineffective, Defendant's claim has no merit and is denied.

## H. Defendant's counsel was not ineffective for not objecting to the prosecution's conduct during closing argument.

Seventh, Defendant claims that his counsel was ineffective for failing to object to the assistant district attorney's "theatrics" during closing argument. Defendant claims the assistant district attorney "repeatedly slapped the juror podium, became verbally vulgar, and intimidating toward jury [sic]. Throwing books of statements previously read into record and using obscene language, all during closing arguments." Nothing in the record discloses any form of intimidation toward the jury whatsoever. Defendant fails to identify one single prejudicial remark. Contrary to Defendant's assertions, the assistant district attorney's arguments constantly directed the jury to consider the evidence at trial. N.T., Trial Vol. XIV, 3/2/17, at 113-140 (Commonwealth's closing argument).

Nothing in the law requires a prosecuting attorney to maintain a constant deportment of insipid stoicism. Rather, an assistant district attorney is an advocate who is entitled to the use of oratorical flair in presenting argument and in directing the jury to the evidence.

> [M]indful of our concomitant allowance of oratorical flair, we hold that offense-centric statements generally are permissible. These are statements that speak to the elements of the particular charges levelled against the defendant and the evidence necessary to prove those elements at trial . . . The prosecutor must be free to argue that the facts of record establish every element of the crime charged, and must be free to respond fairly to the arguments of the defense. Thus, we should not preclude or condemn a prosecutor's characterizations of the defendant that are both based upon the record and that inherently inform elements of an offense at issue, especially where the remarks constitute a fair response to defense counsel's argument.

Commonwealth v. Clancy, 192 A.3d 44, 65 (Pa. 2018).

19

Defendant's conclusory assertion that the "[p]rosecutor deprived [Defendant] of a fair trial, by distracting jury of their task by the theatric of an over-zealous prosecutor" is without any factual support. Upon reviewing the record in this case, the Court finds nothing in the record to support Defendant's characterization of the Commonwealth's closing argument. Nothing in the assistant district attorney's argument exceeded the reasonable bounds of oratorical flair. Nothing in the argument attempted to divert the jury from the facts. Rather, the Commonwealth's argument repeatedly directed the jury to consideration of the evidence in the case.

Defendant's claim is again unsupported by the record. Defendant fails to raise a claim of arguable merit and fails to indicate in what way he was prejudiced. His counsel was therefore not ineffective. Because his counsel was not ineffective, Defendant's claim has no merit and is denied.

## I. Defendant's counsel was not ineffective for not objecting to the prosecution's questions of Brad LaVelle concerning potential bias.

Eighth, Defendant claims that his counsel was ineffective for failing to object to the assistant district attorney's questions of Brad LaVelle regarding who paid for his lunch that day. Defendant asserts that counsel should have objected because the Commonwealth's questioning was "insinuating and suggesting counsel for appellant paid defense witness Brad LaVelle to testify on behalf of defense. . ." The interaction occurred in the following context:

[BY ASSISTANT DISTRICT ATTORNEY]

Q. Okay. And you came here today, you're subpoenaed by the defense, is that fair to say?

A. Yes.

Q. And you come here at 10:30, and then where do you go, do you stay at the courthouse?

A. Yeah, I did until lunchtime, and then I went down the street to get something to eat, yes.

Q. Did you have money for that?

20

A. Yeah.

Q. How did you have money for that?

A. Colafeller (sic) gave me a few bucks to get something to eat.

Okay. I don't have any further questions.

THE COURT: Redirect.

REDIRECT EXAMINATION

BY MR. COLAFELLA:

Q. Brad, I gave you money for lunch; right?

A. Yes.

Q. Because you had to leave work to come down here; right?

A. Yes.

Q. Did I tell you, if I give you this money for lunch, you got to say whatever I want you to say?

A. No, sir.

Q. Did you get paid when you testified for the Commonwealth, did you receive a witness fee for testifying?

A. No.

Q. Did you receive rides to court?

A. No.

N.T., Trial Vol. XII, 2/28/17, at 205.

"The credibility of a witness may be impeached by any evidence relevant to that issue, except as otherwise provided by statute or these rules." Pa.R.E. 607(b). Accord Commonwealth v. Hoover, 107 A.3d 723, 730 (Pa. 2014) ("Evidence to impeach the credibility of a witness is admissible so long as it is relevant to that purpose and not otherwise barred."); Commonwealth v. Carson, 590 Pa. 501, 561, 913 A.2d 220, 254 (2006) ("Any evidence relevant to the impeachment issue may be used against a witness, except that which is prohibited by the rules of evidence.").

21

A reading of the transcript plainly shows that the Commonwealth's cross-examination related to Brad LaVelle's potential bias in favor of Defendant based upon his attorney buying the witness lunch. Such evidence is probative of the truthfulness of the witness' testimony. It is relevant and admissible. The brief questioning, as reproduced above in full, however, was not particularly highlighted or exaggerated. Further, as the record quoted above shows, while Defendant's counsel did not object to the questioning, he did immediately follow up the assistant district attorney's questions with examination directed towards clarifying the circumstances, and LaVelle testified that he was not paid to testify for the defense. The jury was therefore able to weigh the testimony accordingly.

Because the Commonwealth's questioning was relevant impeachment evidence, Defendant fails to raise a claim of arguable merit. Defendant also fails to establish any prejudice that resulted. His counsel, who immediately took steps to clarify the circumstances through additional examination, was therefore not ineffective. Because his counsel was not ineffective, Defendant's claim has no merit and is denied.

## J. Defendant's counsel was not ineffective for not objecting to, or requesting, a jury instruction concerning evidence of Tyrone Fuller's guilty plea.

Ninth, Defendant claims that his counsel was ineffective for not objecting to evidence concerning Tyrone Fuller's guilty plea. Defendant also claims that his counsel was ineffective for not requesting jury instructions concerning evidence of the guilty plea. The evidence of Tyrone Fuller's guilty plea, his cooperation with the Commonwealth's investigation, and his potential sentence if he had not pled, were all used by the defense to cross-examine him extensively and to establish his favorable treatment, potential bias, and motive to lie. N.T. Trial, Vol. IX, 8/19/14, at 8; N.T., Trial, Vol. X, 8/20/14, 5-78. Additionally, Defendant himself testified that it was Fuller

22

who shot and killed the victims. Thus, the evidence of Fuller's guilty plea to murder was corroborative of Defendant's testimony, and was further used to impeach Fuller's credibility.

Rather than being considered objectionable, evidence of a co-defendant's plea agreement has long been considered to be material exculpatory evidence which a defendant is entitled to know about and to present to the jury in order to impeach the testifying co-defendant. E.g., Commonwealth v. Johnston, 434 Pa.Super. 451, 461 (1994) ("We believe that [the co-defendant's] plea bargain was material to [the defendant's] case because it would have shown that he had a motivation to testify against [the defendant] and that he was not merely testifying so that the truth would be told.").

Defendant cites to Bisaccia v. Attorney Gen. of State of N. J., 623 F.2d 307, 312 (3d Cir. 1980). The case is inapposite, however, and Bisaccia, decided by a federal intermediate appellate court, is not binding on this Court. In Bisaccia, the Court of Appeals for the Third Circuit held "that use of a co-conspirator's guilty plea as substantive proof of a defendant's complicity in a conspiracy without cautionary instruction is not admissible as evidence," and warranted federal *habeas corpus* relief. Id. In this case, however, the co-defendant's plea was to murder, not conspiracy, and Defendant's counsel argued precisely that point to the jury. N.T., Trial, Vol. XIV, 3/2/17, at 69 ("[H]e didn't plead guilty to that. He pled guilty to third degree murder, killing with malice. That's what he pled guilty to. He did not plead guilty to robbery or conspiracy to commit robbery. Think about that, because that's not what was happening.").

Additionally, Fuller's guilty plea was not admitted as substantive evidence of the conspiracy, nor as substantive proof of Defendant's guilt. Rather, it was used as impeachment evidence against Fuller based open his potential bias and hope or expectation of leniency, particularly because Fuller had not yet been sentenced at the time he originally testified. As

23

explained previously, the Court gave an accomplice liability instruction which specifically told the jury that, in view of Fuller's involvement and status in this case, it must view his testimony with disfavor in that it comes from a corrupt and polluted source. Id. at 155. The Court further instructed the jury to consider the bias, prejudice, or motive to lie that a witness may have. Id. at 147.

Because the evidence of Tyrone Fuller's plea was relevant for impeachment purposes, the very thing it was used for, Defendant fails to state a claim of arguable merit. Defendant's counsel also plainly used the evidence to impeach Tyrone Fuller. Defendant therefore also fails to establish that his counsel had no reasonable strategy for not objecting. Additionally, the Court did instruct the jury concerning the testimony of an accomplice, as well as a witness' bias, prejudice, or motive to lie. Accordingly, Defendant fails to establish in what way he was prejudiced. Defendant has therefore failed to prove that his counsel was ineffective. Because his counsel was not ineffective, Defendant's claim has no merit and is denied.

## K. Defendant's counsel was not ineffective for not requesting a mistrial.

Tenth, Defendant claims that his counsel was ineffective for failing to request a mistrial. Defendant claims that the jurors were hopelessly deadlocked for three days. After deliberating for a period of time, the jurors submitted a question, stating, "The jury cannot come to []an agreement. What would be our next instruction?" N.T., Trial, Vol. XV, 3/2/17, at 38. The Court then held a sidebar. Id. at 39. The Court inquired whether the parties wished the Court to ask if further deliberations would result in a verdict. Id. The Commonwealth expressly deferred to Defendant's counsel, who indicated that he would prefer to release them for the evening and bring them back afterward for further deliberations. Id.

THE COURT: You've had the opportunity to observe the jurors' demeanor coming in. Does the Commonwealth and the defense want to ask any further

24

question of whether or not do the jurors believe that further deliberations would result in the a verdict?

MISS SMITH: Ask the defense first. I guess it's their --

THE COURT: Do you want me to release them for the evening?

[MR. COLAFELLA:] You know what I think.

THE COURT: I don't know unless you tell me.

[MR. COLAFELLA:] I think they're just burned out. I know if you ask them, I know what their answer is going to be. I think we just inform them we know its [sic] been a long day, a long process, and they need to come back Monday to deliberate and see if it goes anywhere. It has been probably nine hours all together, not terribly long.

THE COURT: Okay.

Id.[4]

"When an event prejudicial to the defendant occurs during trial only the defendant may move for a mistrial; the motion shall be made when the event is disclosed. Otherwise, the trial judge may declare a mistrial only for reasons of manifest necessity." Pa.R.Crim.P. 605(B). Whether to declare a mistrial is discretionary with the trial court. Commonwealth v. Tejeda, 834 A.2d 619, 623-624 (Pa.Super. 2003). "The determination by a trial court to declare a mistrial after jeopardy has attached is not one to be lightly undertaken, since the defendant has a substantial interest in having his fate determined by the jury first impaneled." Commonwealth v. Walker, 954 A.2d 1249, 1254 (Pa.Super.2008). "A failure of the lower court to consider less drastic alternatives before declaring a mistrial creates doubt about the exercise of the court's discretion and may bar re-prosecution because of double jeopardy." Commonwealth v. McCord, 700 A.2d 938, 943 (Pa.Super.1997).

---

[4] The Transcript as typed does not expressly indicate that it was Defendant's trial counsel who was speaking, but the context of the transcript makes that clear, and is confirmed by the Court's own independent recollection of the trial. The Court has added brackets indicating as such for clarity of reading.

25

There is no established test for determining the existence of a manifest necessity. *McCord, supra* at 942. "It is, however, recognized that a genuine inability of a jury to agree constitutes a 'manifest necessity' to declare a mistrial over a defendant's objection without offending the defendant's Fifth Amendment rights." *Commonwealth v. Monte*, 459 Pa. 495, 329 A.2d 836, 840 (1974). A genuine inability of a jury to agree upon a verdict occurs if it appears to the trial court that there is no reasonable probability of agreement. *Id.*

Commonwealth v. Young, 35 A.3d 54, 59-60 (Pa.Super. 2011).

When deciding whether a mistrial should be granted based upon jury deadlock, " 'the primary element in judging whether a jury is really deadlocked is the firmness of its communication to the court that it is deadlocked and the judge's belief that such is the case.' " Commonwealth v. Hoover, 314 Pa.Super. 158, 161 (1983) (quoting Commonwealth v. Howard et al, 233 Pa.Super. 496, 335 A.2d 489 (1975)). Additionally, Pennsylvania's courts have approved of instructions to the jury regarding its duty to deliberate where a potential impasse is reached. E.g., Commonwealth v. Spencer, 216 Pa.Super. 169, 263, A.2d 923, 926 (1970); Commonwealth v. Greer, 597 Pa. 373, 398 (2008) ("Nothing in the law requires that deliberations be aborted because jurors may feel uncomfortable in being directed to listen to each other and to attempt to hammer out their differences.").

In this case, Defendant did not request a mistrial. Rather, Defendant's counsel requested that the jury be sent home and allowed to resume deliberations after the weekend. The jury had deliberated, by counsel's own count, for only nine hours. Clearly, the eventual result of the juror's deliberations, i.e., Defendant's conviction, was unknown when Defendant's counsel made the decision. The jurors indicated only that they could not come to an agreement, and did not say they were hopelessly deadlocked. Id. at 38. On this record, it is plain that a manifest necessity did not exist at that time.

It was demonstrated at the PCRA hearing that, further during the trial, Defendant and his trial counsel consulted regarding the issue of the time it was taking the jury to deliberate.

26

Defendant was given a colloquy, consulted with counsel, and a strategic decision was made by the defense to continue to allow the jury to deliberate. N.T., PCRA Hearing, 9/27/21, at 29–34 (citing Volume XVI of the trial transcripts). On direct examination by PCRA counsel, Defendant's trial counsel testified as follows:

Q. And so you two, you and Mr. Kelly discussed that this was a critical and crucial part of the case, and therefore you wanted his input; correct?

A. Correct.

Q. And the reason why this was such an important and critical part of the, critical part of the case is why in your estimation?

A. Well, you know, naturally, the jury has the case at that point. Either the timing of deliberations is always tricky. Because when they've had the case, whether it's the end of the week, the beginning of the week, how long they've been out, your sense of kind of where they are, if you can tell whether there's, and can't always tell, but you can kind of tell from head nods and expressions sometimes if, if it's more than one holdout, but obviously, it's a big decision. Because if you get to that point, you know, where, where especially in a retrial, this is the second time we did the case beginning to end, you know, do we ask for a mistrial and ask that we require the Commonwealth to try it a third time if it's granted, or do we keep pressing to see if we can get an acquittal here, and obviously, that's a big decision. Because if you elect to let them keep going and it doesn't go your way, you know, there's always an element of regret, so it is, it's a very big decision.

Q. An in fairness to you, what you've just described is, you know, in a trial there's other outside factors that people don't see, what you said, the expressions of the jury, correct?

A. Correct.

Q. The timing in which they've been set in those 12 chairs for, to listening to his evidence; correct?

A. Correct.

Q. Even the day of the week has an implication on decision; correct?

A. It absolutely does.

Q. And so you've taken all those factors in considerations as a criminal defense attorney and conferred with Mr. Kelly; correct?

A. I'm sure I would've.

27

Q. And then the Court conducts a colloquy on the record making sure that he's well informed of his decision to have the jury keep the case, right?

A. Yes.

Id. at 32-34. Thus, counsel explained that he considered details all the way down to the day of the week it was in his strategic decision making. Defendant was given a colloquy by the Court as well and indicated that he wanted to allow the jury to continue to deliberate. Defendant's trial counsel was plainly not ineffective on this issue.

Defendant also appears to claim his counsel should have requested a mistrial based upon the Commonwealth not meeting its burden of proof. Defendant's counsel did challenge the weight and sufficiency of the evidence, however, and the Superior Court found on direct appeal that those challenges did not have merit. This claim is therefore also without arguable merit.

Again, Defendant has failed to prove that his claim has any arguable merit, that his counsel did not have a reasonable strategic basis, or that he was prejudiced by counsel's actions. His counsel was therefore not ineffective. Because his counsel was not ineffective, Defendant's claim has no merit and is denied.

## L. Defendant's counsel was not ineffective for not objecting to the Court's jury instructions.

Eleventh, Defendant claims that his counsel was ineffective for failing to object to the Court's instructions to the jury, claiming that the Court's "charge to the jury was rife with prejudicial expressions of guilt, in an attempt to invade the province of the jury."

The Pennsylvania Supreme Court has often reaffirmed the principle that a trial court has considerable discretion in the area of jury instructions. E.g., Commonwealth v. Sandusky, 77 A.3d 663, 667 (Pa.Super. 2013).

A jury charge will be deemed erroneous only if the charge as a whole is inadequate, not clear or has a tendency to mislead or confuse, rather than clarify, a material issue. A charge is considered adequate unless the jury was palpably misled by what

28

the trial judge said or there is an omission which is tantamount to fundamental error. Consequently, the trial court has wide discretion in fashioning jury instructions. The trial court is not required to give every charge that is requested by the parties and its refusal to give a requested charge does not require reversal unless the Appellant was prejudiced by that refusal.

Id. (quoting Commonwealth v. Thomas, 904 A.2d 964, 970 (Pa.Super. 2006)).

Defendant complains that the Court referred to a portion of Tyrone Fuller's testimony concerning statements made by Defendant. This is true. However, the statements were referred to in the context of a standard instruction informing the jury about the findings it must make before it could conclude that Defendant even made the statements. N.T., Trial Vol. XIV, 3/2/17, at 160-61.

> There was also a statement in the former testimony by Mr. Fuller that while at the bar after the murder, after hearing Conekia Finney and her unborn child died, there was allegedly a statement that Marlin Kelly stated, "Man, woman, child, anyone could be smoked."
>
> There was also statements allegedly made during Tammy Barker's testimony.
>
> *Before you consider the statements as evidence against the Defendant, you must find that, first, a crime, in fact, was committed. Two, that the Defendant, in fact, made these statements, and that the statements were voluntary. Otherwise, you must disregard the statements.*
>
> *Each juror should ultimately decide these questions for himself or herself and thereby individually accept or reject the statements as evidence.*

Id. (emphasis added). This instruction was standard instruction 3.01 concerning a defendant's confession or admission. Rather than prejudicing Defendant, it admonished the jury that it could not even accept such statements as being made by Defendant until it first made the required factual determinations. The instruction therefore, far from being prejudicial, was protective of Defendant's rights.

Simply stated, the Court acted impartially when it delivered its final charge to the jury. Nothing of record supports Defendant's assertions. No objection was raised at any time. No

29

statement or comment has been made at any previous time indicating that the Court acted improperly in any form when it provided the jury its final jury instructions. Defendant fails to show in what way he was prejudiced. As with his ten other claims, Defendant's eleventh claim is unsupported by the record. He fails to prove that his claim has arguable merit, and there is no evidence of prejudice. Defendant's counsel was therefore not ineffective. Because his counsel was not ineffective, Defendant's claim has no merit and is denied.

## M. Defendant's counsel was not ineffective concerning instructions regarding conspiracy and second degree murder.

In addition to preserving the eleven issues asserted by Defendant in his *pro se* PCRA Petition, Defendant's first PCRA counsel raised, and current PCRA counsel has preserved, three additional issues in the First Amended PCRA Petition. Defendant's twelfth and thirteenth issues, considered here together, claim:

> Trial counsel was ineffective for failing to request instructions, failing to object to this Court's instructions, and/or in failing to request a cautionary instruction regarding both counts of Second-Degree Murder. This Court's instructions did not specifically articulate that the slayer's act which caused the death must have been committed in furtherance of the design to commit the underlying felony. The errors were not harmless, and Defendant was prejudiced because the instructions supported an erroneous basis to convict.

Amended PCRA, at 5.[5]

Second, Defendant's counsel also claims:

> Trial counsel was ineffective for failing to request instructions, in failing to object to this Court's instructions, and/or in failing to request a cautionary instruction regarding Conspiracy to Commit Robbery. This Court generally and repeatedly referred to Defendant and Tyrone Fuller, a co-defendant and co-operating witness, as "partners." This Court's instructions were not harmless and prejudiced Defendant because they created an inference that their illicit drug

---

[5] The pages of Defendant's Amended PCRA are unnumbered. The Court's numbering in the citations is inclusive of the cover page.

dealing business relationship-a partnership-was sufficient to establish the conspiracy to commit robbery.

Amended PCRA, at 6.

The Court will treat both claims together because both involve the Court's final instructions. As with the claims raised by Defendant in his *pro se* PCRA Petition, PCRA counsel's claims are also manifestly contradicted by the record. N.T., Trial, Vol. XIV, 3/2/17, at 152-54, 171-83.

The law requires that, in order to prove second degree murder, frequently referred to as felony murder, the killing which is committed must be in furtherance of the underlying felony. Regarding second degree murder and second degree murder of an unborn child, a defendant may be liable as a principal or as an accomplice where he is engaged in the commission of an enumerated felony and a person is killed in furtherance of the felony. Commonwealth v. Lambert, 795 A.2d 1010, 1022–23 (Pa.Super. 2002). In Lambert, the Superior Court explained in detail the law and doctrine regarding second degree murder.

> ¶ 40 Murder of the second degree is a criminal homicide committed while a defendant was engaged as a principal or an accomplice in the perpetration of a felony. 18 Pa.C.S.A § 2502(d) defines perpetration of a felony as:
>
>> [t]he act of the defendant in engaging in or being an accomplice in the commission of, or an attempt to commit, or flight after committing, or attempting to commit robbery, rape, or deviate sexual intercourse by force or threat of force, arson, burglary or kidnapping.
>
> 18 Pa.C.S.A § 2502(d) (emphasis added). The malice or intent to commit the underlying crime is imputed to the killing to make it second-degree murder, regardless of whether the defendant actually intended to physically harm the victim.
>
> ¶ 41 The elements of accomplice liability for felony murder were addressed in *Commonwealth v. Middleton,* 320 Pa.Super. 533, 467 A.2d 841, 848 (1983):
>
>> In *Commonwealth v. Waters,* 491 Pa. 85, 95, 418 A.2d 312, 317 (1980), the court discussed the elements to be proved in order to establish accomplice liability for felony murder, saying that:

31

... [t]he responsibility of persons, other than the slayer, for a homicide committed in the perpetration of a felony require[s] proof of a conspiratorial design by the slayer and the others to commit the underlying felony and of an act by the slayer causing death which was in furtherance of the felony.

Moreover, it was stated by the court in *Commonwealth v. Legg*, 491 Pa. at 82, 417 A.2d at 1154:

When an actor engages in one of the statutorily enumerated felonies and a killing occurs, the law, via the felony-murder rule, allows the finder of fact to infer the killing was malicious from the fact the actor was engaged in a felony of such a dangerous nature to human life because the actor, as held to the standard of a reasonable man, knew or should have known that death might result from the felony. (footnote omitted)

*Middleton*, 467 A.2d at 848. In *Commonwealth v. Melton*, 406 Pa. 343, 178 A.2d 728, 731 (1962), *cert. denied*, 371 U.S. 851, 83 S.Ct. 93, 9 L.Ed.2d 87 (1962), our Supreme Court explained that not only the killer, but all participants in a felony, including the getaway driver, are equally guilty of felony murder when a killing by a felon occurs.

¶ 42 The statute defining second degree murder does not require that a homicide be foreseeable; rather, it is only necessary that the accused engaged in conduct as a principal or an accomplice in the perpetration of a felony. Whether evidence sufficiently indicates that a killing was in furtherance of a predicate felony can be a difficult question. The question of whether the killing was in furtherance of the conspiracy is a question of proof for the jury to resolve. It does not matter whether the appellant anticipated that the victim would be killed in furtherance of the conspiracy. Rather, the fact finder determines whether the appellant knew or should have known that the possibility of death accompanied a dangerous undertaking.

Id. at 1022–23 (some citations omitted).

In Commonwealth v. Chambers, 188 A.3d 400, 410 (Pa. 2018), the Supreme Court

expounded on the required elements of conspiracy.

At "the heart of every conspiracy" lies the "common understanding or agreement" between the actors. *Commonwealth v. Kennedy*, 499 Pa. 389, 453 A.2d 927, 929 (1982) (citations omitted). "Implicit in any conspiracy is proof ... that an accused agrees to participate in the alleged criminal activity." *Commonwealth v. Derr*, 501 Pa. 446, 462 A.2d 208, 210 (1983). The criminal union being prosecuted cannot be based upon an agreement to complete a broad, undefined objective at some unknown point. Rather, the agreement must rest upon the mutual specific intent to carry out a particular criminal objective. "The *sine qua non* of a conspiracy is the shared criminal intent." *Weston*, 749 A.2d at 463 (citing *Commonwealth v.*

32

*Wayne*, 553 Pa. 614, 720 A.2d 456, 464 (1998), quoting *Commonwealth v. Schomaker*, 501 Pa. 404, 461 A.2d 1220 (1983)). "Without this common purpose, a conspiracy cannot be maintained." *Derr*, 462 A.2d at 209.

Proving the existence of such an agreement is not always easy, and is rarely proven with direct evidence. *Commonwealth v. Spotz*, 552 Pa. 499, 716 A.2d 580, 592 (1998). "An explicit or formal agreement to commit crimes can seldom, if ever, be proved and it need not be, for proof of a criminal partnership is almost invariably extracted from the circumstances that attend its activities." *Commonwealth v. Strantz*, 328 Pa. 33, 195 A. 75, 80 (1937). Indeed, "[a] conspiracy may be proven inferentially by showing the relation, conduct, or circumstances of the parties, and the overt acts of alleged co-conspirators are competent as proof that a criminal confederation has in fact been formed." *Kennedy*, 453 A.2d at 930.

Id.

In this case, the Court first instructed the jury on the difference between liability as an accomplice and liability as a conspirator. N.T., Trial, Vol. XIV, 3/2/17, at 152-54.

The next area of law that I'll turn to defines the concept of an accomplice and conspiracy and it compares those two.

There are two basic ways that one Defendant may be criminally responsible for the conduct committed by another person or persons. These two ways may apply even if the Defendant in question was not present at the time and place when the act occurred.

The first way is for the Defendant to be a member of a conspiracy. In a few moments I will define for you what a conspiracy is and how it's proven. For our purposes now it is enough to understand that a conspiracy exists when two or more people agree to commit a crime or a series of crimes *and one commits an act to further the goal of that agreement.*

As applied in this case if it is proven beyond a reasonable doubt that the Defendant was indeed a member of a conspiracy he may be held responsible for the act or acts of another person or person if each of the following elements is proven beyond a reasonable doubt:

That the other person who committed a specific act was also a member of the same conspiracy.

That the crime in question was committed while the conspiracy was in existence.

*And that the crime in question was committed to further the goals of the conspiracy.*

33

There is a second and separate way that one Defendant can be proven liable for the conduct of another person or persons. That is, when the Defendant is an accomplice of the person who actually commits the crime at issue.

There is a basic difference between being an accomplice and being a co-conspirator, excuse me, conspirator.

In a conspiracy people agree to act jointly.

To be an accomplice a person does not have to agree to help someone else. The person is an accomplice if he, on his own, acts to help the other person commit a crime.

More specifically, a Defendant is an accomplice of another for a particular crime if the following two elements are proven beyond a reasonable doubt:

*That the Defendant had an intent of promoting or facilitating the commission of the crime.*

That the Defendant solicits, commands, encourages, requests the other person to commit it or aides, agrees to aid, or attempts to aid the other in the planning or committing it.

It is important to understand that a person is not an accomplice merely because he is present when the crime is committed or knows that the crime is being committed.

A person is an accomplice, a person who is an accomplice will not be responsible for the crime if, and only if, the person before the other person commits the crime either stops his own efforts to promote or facilitate the commission of the crime and either wholly deprives his previous efforts of effectiveness in the commission of the crime or gives timely warning to the law enforcement authorities or otherwise makes a proper effort to prevent commission of the crime.

Id. (emphasis added).

The Court later turned to the specific elements of conspiracy, second degree murder, and second degree murder of an unborn child. Id. at 171-83.

The law of felony murder does not require that a homicide be foreseeable rather it is only necessary that the Defendant engaged in conduct as a principal or an accomplice in the perpetration of a felony.

Finally, where there is an existence of a conspiracy is proven a Defendant who conspires is fully responsible for the natural and probable consequence of any acts committed by a co-conspirator *which are done in furtherance of the conspiracy.*

34

The Defendant is responsible even though he was not physically present when the acts were committed by the co-conspirator and extends even to a homicide, which is the natural and probable consequence of execution of the conspiracy even if the homicide was not specifically contemplated by the Defendant or his co-conspirators.

Id. at 171-72 (emphasis added).

Although the agreement itself is the essence of the conspiracy, *a Defendant cannot be convicted of conspiracy unless he or a fellow co-conspirator does something more, and that's what we call an overt act, in furtherance of the conspiracy.*

*The overt act is an act by any member of the conspiracy that would serve to further the goals of the conspiracy.* The overt act can be criminal or non-criminal in itself as long as it's designed to put the conspirator agreement into effect.

I apologize.

This is to show that the parties have a firm agreement and are not just thinking or talking about committing a crime. The overt act shows that the conspiracy has reached the action stage.

*If a co-conspirator actually commits or attempts to commit the agreed crime, that obviously would be an overt act in furtherance of the conspiracy.*

But a small step or a step that is much more preliminary and a lot less significant can satisfy the overt act requirement.

Id. at 174-75 (emphasis added).

In order to find the Defendant guilty of conspiracy to commit robbery, you must be satisfied that the following three elements have been proven beyond a reasonable doubt:

First, that the Defendant agreed with the other person that one or more of them would engage in conduct for the planning or commission of the crime of robbery.

Second, that the Defendant and other persons intended to promote or facilitate committing the robbery. In other words, they shared the intention to bring about that crime or make it easier to commit that crime.

And third, *that the Defendant or other persons did the act they're alleged to have been overt acts and did them in furtherance of the conspiracy.*

As a general rule, if co-con-, *if conspirators have agreed to commit a crime and after that one of the conspirators does any act to carry out or advance their*

35

*agreement, then he has done an overt act in furtherance of their conspiracy.* The other conspirator does not have to participate in the act or even know about it. In a sense they are partners, and like partners they are responsible for each other[']s actions.

Id. at 177-78 (emphasis added).

Now, the Defendant has been charged with second degree murder and that is in regards to Conekia Finney. To find the Defendant guilty of this offense you must find the following four elements have been proven beyond a reasonable doubt:

First, that Defendant or Tyrone Fuller caused the death of Conekia Finney.

Second, that the Defendant or Tyrone Fuller did so while they were partners in committing a certain robbery.

Third, *that Defendant or Tyrone Fuller did the act that caused the death of Conekia Finney in furtherance of the robbery.*

And, fourth, that the Defendant was acting with malice. You may find that the Defendant was acting with malice if you are satisfied beyond a reasonable doubt that he and Tyrone Fuller were partners in committing the robbery. Because robbery is a crime inherently dangerous to human life, there does not have to be any other proof of malice.

Id. at 179-80 (emphasis added).

Finally, the Court turned to explain what the legal requirements were for Defendant and Tyrone Fuller to be considered partners with regard to the conspired robbery, and what the legal requirements were with regard to the "in furtherance" element.

*Going back to the requirement that Defendant and Tyrone were partners in committing the robbery, I instruct you that they were partners if they were both principals or one of them was a principal and the other was an accomplice.*

A person is a principal if he actually commits the crime or makes an attempt himself. *A person is an accomplice if with an intent of encouraging or helping the commission of the crime he asks the principal to commit it or helps or agrees or attempts to help the principal in committing it.*

I also instruct you that they were partners if they conspired to commit robbery. Two persons conspire to commit a crime if they intend to, if with intent of encouraging or helping the commission of the crime they agree that one or both of them will commit the crime or that one of them will help the other in planning or committing it.

36

Their agreement may be expressed and verbal.

They may actually talk about it or their agreement may be unspoken agreement that can be inferred from their words and conduct and surrounding circumstances. Each knows what the other is thinking. They don't have to talk about it.

And, finally, to complete the conspiracy one of the co-conspir-, one of the conspirators must commit what the law calls an overt act. *An overt act is the act by any member of the conspiracy that would serve to further the goal of the conspiracy.*

Here the Commonwealth contends that causing the death of Conekia Finney while in the course of committing the theft from Steven Murray was such act.

*I will now explain to you the meaning in furtherance element. A partner acts that kills, a partner act that kills is not in furtherance of a felony if the partner does the act for his own personal reason that are independent of the felony.*

*A partner's acts that kills is in furtherance of the felony if he does the act while fleeing from the scene and if there is no break in the chain of events between the felony and the act.*

*However, even though the partner act that kills may seem to meet the requirements, it is not in furtherance of the felony if the partner does the act for his own personal reason that are independent of the felony and the effort to flee.*

To summarize, in order to prove felony murder, the Commonwealth is not required to prove that the Defendant actually committed the robbery nor is the Commonwealth required to prove the completion of the robbery.

Rather, the Commonwealth must prove beyond a reasonable doubt that the victim was killed while the Defendant was engaged as either a principal or accomplice in the commission, attempt, or flight after committing or attempting to commit the robbery.

Id. at 181-83 (emphasis added).

The record makes clear that the Court gave extensive instructions to the jury concerning the requirement that the killing be in furtherance of the underlying felony.[6] The record also makes

---

[6] In her summation to the jury, the Assistant District Attorney also argued that the killing of Conekia Finney and her unborn child were committed in furtherance of the conspiracy to commit robbery.

clear that the Court did not simply label Defendant as Fuller's partner. Rather, the Court explained what facts must have been found by the jury with regard to Defendant's alleged partnership with Fuller in the conspiracy to commit robbery which ultimately resulted in the killing of Conekia Finney and her unborn child. Further, Defendant's counsel *did* object to the Court's instructions. N.T., PCRA Hearing, 09/27/2021, at 44-49. Defendant's trial counsel cannot be ineffective for an instruction given by the Court when counsel objected to the instruction being given.

The Court's instructions did not imply "that their illicit drug dealing business relationship-a partnership-was sufficient to establish the conspiracy to commit robbery," as asserted in the First Amended PCRA Petition. Rather, the Court's detailed instructions correctly charged the jury on the facts it was legally required to find in order for Defendant to be held liable as a conspirator or accomplice. These claims lack any support from the record. Again, Defendant has failed to prove that his claim has any arguable merit. His counsel was therefore not ineffective. Because his counsel was not ineffective, Defendant's claim has no merit and is denied.

## N. Defendant's counsel was not ineffective concerning Defendant's decision to proceed to trial.

The Court turns to next to the third claim from the First Amended PCRA Petition, the fourteenth claim overall: that trial counsel was ineffective for advising Defendant to proceed to trial. Defendant claims he was offered a plea for 20 to 40 years, presumably to third degree murder. The Court notes that no such plea offer was ever presented to the Court for its consideration prior to the second trial.

---

And guess what, ladies and gentlemen, the defense already alluded to this. We don't have to show you that he was the shooter. That was a bonus for you. We don't have to show that. All we have to show is there was a plan to rob him, and I told you why there was, and these people were involved. There was an overt act taken in furtherance of that plan, and somebody died.

N.T., Trial, Vol. XIV, 3/2/17, at 131.

38

Unlike many other cases where a criminal defendant claims ineffective assistance of counsel after accepting a guilty plea, here Defendant claims ineffective assistance in *rejecting* a guilty plea offer. The United States Supreme Court has provided guidance on just such a claim. Lafler v. Cooper, 566 U.S. 156, 132 S. Ct. 1376, 182 L. Ed. 2d 398 (2012).

> To establish *Strickland* prejudice a defendant must "show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.*, at 694, 104 S.Ct. 2052. In the context of pleas a defendant must show the outcome of the plea process would have been different with competent advice. See *Frye, ante,* at 1388 – 1389, 132 S.Ct. 1399 (noting that *Strickland*'s inquiry, as applied to advice with respect to plea bargains, turns on "whether 'the result of the proceeding would have been different' " (quoting *Strickland, supra,* at 694, 104 S.Ct. 2052)); *see also Hill,* 474 U.S., at 59, 106 S.Ct. 366 ("The ... 'prejudice,' requirement ... focuses on whether counsel's constitutionally ineffective performance affected the outcome of the plea process"). In *Hill,* when evaluating the petitioner's claim that ineffective assistance led to the improvident acceptance of a guilty plea, the Court required the petitioner to show "that there is a reasonable probability that, but for counsel's errors, [the defendant] would not have pleaded guilty and would have insisted on going to trial." *Ibid.*
>
> In contrast to *Hill,* here the ineffective advice led not to an offer's acceptance but to its rejection. Having to stand trial, not choosing to waive it, is the prejudice alleged. In these circumstances a defendant must show that but for the ineffective advice of counsel there is a reasonable probability that the plea offer would have been presented to the court (*i.e.,* that the defendant would have accepted the plea and the prosecution would not have withdrawn it in light of intervening circumstances), that the court would have accepted its terms, and that the conviction or sentence, or both, under the offer's terms would have been less severe than under the judgment and sentence that in fact were imposed. Here, the Court of Appeals for the Sixth Circuit agreed with that test for *Strickland* prejudice in the context of a rejected plea bargain. This is consistent with the test adopted and applied by other appellate courts without demonstrated difficulties or systemic disruptions.

Id. at 1384-85.

> In some situations it may be that resentencing alone will not be full redress for the constitutional injury. If, for example, an offer was for a guilty plea to a count or counts less serious than the ones for which a defendant was convicted after trial, or if a mandatory sentence confines a judge's sentencing discretion after trial, a resentencing based on the conviction at trial may not suffice. See, *e.g., Williams,* 571 F.3d, at 1088; *Riggs v. Fairman,* 399 F.3d 1179, 1181 (C.A.9 2005). In these circumstances, the proper exercise of discretion to remedy the constitutional injury may be to require the prosecution to reoffer the plea proposal. Once this has

39

occurred, the judge can then exercise discretion in deciding whether to vacate the conviction from trial and accept the plea or leave the conviction undisturbed.

In implementing a remedy in both of these situations, the trial court must weigh various factors; and the boundaries of proper discretion need not be defined here. Principles elaborated over time in decisions of state and federal courts, and in statutes and rules, will serve to give more complete guidance as to the factors that should bear upon the exercise of the judge's discretion. At this point, however, it suffices to note two considerations that are of relevance.

First, a court may take account of a defendant's earlier expressed willingness, or unwillingness, to accept responsibility for his or her actions. Second, it is not necessary here to decide as a constitutional rule that a judge is required to prescind (that is to say disregard) any information concerning the crime that was discovered after the plea offer was made. The time continuum makes it difficult to restore the defendant and the prosecution to the precise positions they occupied prior to the rejection of the plea offer, but that baseline can be consulted in finding a remedy that does not require the prosecution to incur the expense of conducting a new trial.

Id. at 1389.

At the PCRA Hearing, Defendant's counsel could not recall whether any plea offer had actually been made. N.T., PCRA Hearing, 09/27/2021, at 52-53, 78. Defendant himself testified that his counsel had informed him that the Commonwealth had offered a plea for an agreed sentence of twenty to forty years, but that he rejected it on the advice of counsel. Id. at 103-05.

The Court notes that at no time was it advised that any offer for a plea had ever been made. No written memorandum or other documentary evidence of a plea offer was presented during the PCRA hearing. Normally, such an offer, particularly in a case of this magnitude, would be reduced to writing and the existence of such an offer would be communicated to the Court, which would then proceed to colloquy the defendant regarding the offer. Because no such offer was ever reduced to writing or communicated to the Court during either the first or second trial, and because Defendant's counsel had no recollection that any such offer had ever been made, the Court finds that, in fact, no such offer was ever made. The Court finds Defendant's testimony that the Commonwealth made such an offer not to be credible and contrary to the record.

40

Even if the Court did believe Defendant, he testified that he followed his counsel's advice in rejecting the offer, and indicated his counsel's strategic basis for recommending that he proceed to trial. Accordingly, Defendant never testified that he would have actually accepted the offer, even if it had been made, and a strategic basis existed for the rejection of the alleged offer.

Defendant has failed to prove that his counsel was ineffective regarding the decision to proceed to trial. Defendant could have been acquitted by the second jury of the charges of felony murder just as the first jury had acquitted him of the charge of robbery. It appears to the Court that Defendant entertained a hope that he would be acquitted, based upon his proceeding to trial and testifying on his own behalf twice, both times stating under oath that he was innocent of the charges. Nor could Defendant have been ignorant of the potential consequences of conviction and the imposition of the mandatory sentences of life imprisonment; he had already been convicted and received the mandatory sentences once before, after his first trial. Compare, e.g., Commonwealth v. Steckley, 128 A.3d 826, 836-838 (Pa.Super. 2015) (citing Lafler v. Cooper and finding that counsel was ineffective concerning rejection of guilty plea where counsel failed to advise the defendant concerning an applicable mandatory sentence if convicted at trial).

Additionally, a plea offer by the Commonwealth is not binding unless and until the trial court accepts the plea. Commonwealth v. Chazin, 873 A.2d 732, 737 (Pa.Super. 2005).

> "The Pennsylvania Rules of Criminal Procedure grant the trial court broad discretion in the acceptance and rejection of plea agreements. There is no absolute right to have a guilty plea accepted." *Commonwealth v. Hudson,*820 A.2d 720, 727-28 (Pa.Super. 2003). Accordingly, our Courts have reaffirmed that "[w]hile the Commonwealth and a criminal defendant are free to enter into an arrangement that the parties deem fitting, the terms of a plea agreement are not binding upon the court. Rather the court may reject those terms if the court believes the terms do not serve justice." *Commonwealth v. White,*787 A.2d 1088, 1091 (Pa.Super. 2001). As these holdings make apparent, the Commonwealth's offer of plea, even if accepted by the defendant unequivocally, does not dispose of a criminal prosecution; indeed, the plea bargain is of no moment until accepted by the trial court.

Id. (quotation marks and citations omitted)

41

This Court can state without any hesitation whatsoever that it would not have accepted a plea to third degree murder or another lesser charge after Defendant's first trial, nor would it accept such a plea at this current time. Defendant testified under oath at his first trial that there was no conspiracy and that he did not shoot Conekia Finney. The Court would not have accepted a subsequent plea by Defendant after his former testimony under oath that he was innocent of the crimes charged and that he did not conspire with Fuller. His sworn testimony would have utterly contradicted the factual basis for such a plea, and would have placed the Court in the position of having to determine whether Defendant had perjured himself at his first trial, or was perjuring himself presently while pleading guilty. See, e.g., Commonwealth v. Fluharty, 429 Pa.Super. 213, 219 (1993) (quoting Commonwealth v. Maddox, 450 Pa. 406, 409-410, 300 A.2d 503, 505 (1973)) (" 'It is clear that before accepting a plea of guilty, the trial court must satisfy itself that there is a factual basis for the plea.' "); Commonwealth v. Roundtree, 440 Pa. 199, 202, 269 A.2d 709, 711 (1970) ("[I]f a defendant pleads guilty to a criminal charge, and in the next breath contravenes the plea by asserting facts which, if true, would establish that he is not guilty, then his guilty plea is of no effect and should be rejected."); Commonwealth v. Coleman, 438 Pa. 373, 377, 264 A.2d 649, 651 (1970) (external citations omitted) ("Recanting testimony is exceedingly unreliable, and it is the duty of the court to deny a new trial where it is not satisfied that such testimony is true. There is no less reliable form of proof, especially when it involves an admission of perjury.").

Nor would this Court have accepted the plea after Defendant had already been convicted of the murders by a unanimous jury after his first trial.[7] This Court has the utmost respect for a

---

[7] While Defendant's first conviction was reversed by the Superior Court, that reversal was not due to insufficient evidence. Nor was it due to any defect in the trial itself. Nor was it due to any issue with any juror who actually served at the first trial. Rather, Defendant's conviction after the first trial was reversed because a prospective juror, who ultimately never served on the jury, was also a police officer, and because Defendant was required to use a peremptory challenge to remove him instead of a challenge for cause based upon the Court's understanding of the law as it existed at that time. See Commonwealth v. Kelly, 134 A.3d 59 (Pa.Super. 2016).

42

jury's service and its ultimate verdict. Furthermore, under Article 1, Section 6 of the Pennsylvania Constitution, both the Defendant and the Commonwealth have a right to a trial by jury. Thus, a jury's verdict has special constitutional import not only with regard to a Defendant's expectations, but also the Commonwealth's. For this reason also, the Court would not have accepted a plea following Defendant's first trial. See Chazin, 873 A.2d at 737-38 ("The court would have rejected the resulting bargain. . . Without evidence that the result of the plea bargain process would have been different had he been able to accept the Commonwealth's original offer, [the defendant] necessarily fails to satisfy the prejudice prong requisite to a finding of IAC.").

This claim, as with each and every one of Defendant's other claims, lacks any support from the record. Defendant has failed to demonstrate that his claim has any arguable merit or that his counsel did not have a reasonable strategic basis. Defendant's counsel was therefore not ineffective. Because his counsel was not ineffective, Defendant's claim has no merit and is denied.

## O. Defendant's counsel was not ineffective for questioning Defendant on direct examination regarding his decision not to cooperate with the Commonwealth.

Defendant's fifteenth issue, and the first new issue raised in his Second Amended PCRA Petition, is a claim that counsel was ineffective for asking Defendant on direct examination: "Did you go running to the DA's Office to cooperate?" Second Amended PCRA Petition, 9/15/2021, at 5–6; N.T. Trial, Vol. XIII, 3/1/2017, at 81; N.T. PCRA Hearing, 9/27/2021, at 17; Brief, 11/29/2021, at 6–10. Defendant argues that this violated his Pennsylvania and federal constitutional rights against self-incrimination because it elicited Defendant's pre-arrest or post-arrest silence. Brief, 11/29/2021, at 4. He further argues that this opened the door to the prosecution's infringing on that right. Id. at 11. He concludes that this error was not harmless. Id. at 12–14. The Court finds that the claim lacks merit, that the question asked by Defendant's

43

counsel was part of his reasonable trial strategy, and that Defendant suffered no prejudice as a result.

Generally, claims that a defendant's right against self-incrimination was violated arise when the *prosecution* references and exploit a defendant's post-arrest silence for the purpose of showing guilt. E.g., Commonwealth v. Adams, 628 Pa. 600, 104 A.3d 511 (2014) (plurality). Here, however, Defendant's challenge stems from a question asked by his *own* attorney. Subsequent to this question on direct examination, the Court had a discussion with counsel at sidebar and in chambers, where the Assistant District Attorney advised that she wanted to ask a question based on the direct examination. N.T. Trial, Vol. XIII, at 89–90. Defense counsel stated that the prosecutor's question could violate Defendant's rights. Id. at 89. The Court warned the Assistant District Attorney that her question could not comment on or implicate Defendant's right to remain silent. Id. at 90.

The Court first determines that Defendant's claim does not have merit. "Even an explicit reference to silence is not reversible error where it occurs in a context not likely to suggest to the jury that silence is the equivalent of a tacit admission of guilt." Commonwealth v. Whitney, 550 Pa. 618, 633, 708 A.2d 471, 478 (1998) (citing Commonwealth v. Crews, 536 Pa. 508, 526-30, 640 A.2d 395, 404-06 (1994)). Moreover, "when a criminal defendant waives his right to remain silent and testifies at his own trial, neither the United States nor the Pennsylvania Constitution prohibit a prosecutor from impeaching a defendant's credibility by referring to his pre-arrest silence." Commonwealth v. Bolus, 545 Pa. 103, 113, 680 A.2d 839, 844 (1996); accord Commonwealth v. Kuder, 62 A.3d 1038 (Pa. Super. 2013). While Bolus permits a prosecutor to use a testifying defendant's pre-arrest silence for impeachment purposes, it does not preclude references to silence in other relevant circumstances, such as in giving a fair response to defense

44

arguments at trial. Commonwealth v. DiNicola, 581 Pa. 550, 561 n.6, 866 A.2d 329, 336 n.6 (2005); Commonwealth v. Molina, 628 Pa. 465, 494, 104 A.3d 430, 447 (2014) (plurality). Here, Defendant's noncooperation with police was not made in a context likely to suggest that it was a tacit admission of guilt. Rather, as noted *infra*, it was part of a comprehensive trial strategy of distinguishing Defendant from Tyrone Fuller. Defendant's position was that unlike Fuller, Defendant did not cooperate with the Commonwealth because he was not involved and had nothing to contribute. N.T. PCRA Hearing, 9/27/2021, at 14–15.

Nor is there arguable merit based on the questions asked by the Commonwealth. The prosecutor confirmed with Defendant that "you're street smart, and you're not supposed to be a snitch," and that "[i]t's bad to be a snitch ... in your line of work." N.T. Trial, Vol. XIII, 3/1/2017, at 126. She continued in her cross-examination of Defendant:

> Q. ... So then at some point in time, by the way, you know that Tyrone Fuller comes to the DA's Office; right?
>
> A. Yes.
>
> Q. To snitch on you?
>
> A. Yes, he comes to testify.
>
> Q. Okay. **You never came to the DA's office to snitch on him, though; right? Yes or no?**
>
> A. **No.**

N.T. Trial, Vol. XIII, 3/1/2017, at 184 (emphasis added). This was mentioned in the Commonwealth's closing argument:

> Look at how mad [Defendant] got when he was talking about Tyrone Fuller snitching. Look at how mad he got, Tyrone Fuller went running to the district attorney's office. Tyrone Fuller's a psychopath.
>
> **Then I asked him who didn't, who didn't go running to the district attorney's office, you.** He doesn't like snitches. Tyrone Fuller is only going to do 13 years.

45

He got 13 to 30, to 30 years, not with 26 years and special probation. That was a falsehood. 30 years.

And what he's banking on, ladies and gentlemen, is the fact that you have such disgust and distaste for what Tyrone Fuller got and all of these other people that you won't look too hard at him, because all these other people are dirt bags.

N.T. Trial, Vol. XIV, 3/2/2017, at 118 (emphasis added). The questions posed by the Assistant District Attorney are narrower than those of Defendant's counsel. The Commonwealth's questions ask only if it is bad to be a snitch and if Defendant went to the DA's office to snitch on Fuller. This does not amount to implying that he did not do so as a tacit admission of guilt. Nor was it necessary for Defendant to "open the door" for the Commonwealth to ask this question, as Defendant allowed the Commonwealth to attempt to impeach him based on his pre-arrest silence by choosing to testify. Bolus, 545 Pa. at 113, 680 A.2d at 844. Regarding the Commonwealth's closing argument, the Court finds that the reference to Defendant's not running to the District Attorney's Office is a fair response that accurately characterizes Defendant's trial strategy. Because the Commonwealth's question and argument did not imply a tacit admission of guilt and were not objectionable based on Defendant's choice to testify, this claim does not have arguable merit.

Even if the claim had arguable merit, the Court first finds that counsel's question was part of a reasonable trial strategy: to discredit the testimony of Tyrone Fuller and to contrast Fuller's behavior with Defendant's. Counsel explained:

You know, naturally, we're trying to drive the point home. We were, it was difficult because Fuller didn't testify, so, and Leo didn't testify, so we didn't have confederate testimony co-confederate testimony in the second trial. So in an effort to really try to amplify that fact that all of these cooperatives were proactively seeking consideration and, you know, special consideration for their testimony and cooperation, I really wanted to drive that point home, but we weren't among those that, that had anything to hide or anything to prove, so, or anything to gain, so yeah, but obviously, I asked the question in the way that I did.

...

46

[W]as I horribly bothered by it? No, because it was true he didn't go running to the District Attorney's Office like the other individuals asking for a deal, and I believe I presented to the jury in the context of, you know, he had nothing to contribute because he was not involved, and that was the implication.

N.T., PCRA Hearing, 9/27/2021, at 38, 50; id. at 57–59, 61–62 (explaining the overall trial strategy of emphasizing Fuller's culpability); id. at 66 (explaining that he asked the question "to amplify for the jury [Defendant's] steadfast position that he was not involved and wasn't about to take a deal unlike Mr. Fuller and admit to something he didn't do"); id. at 70, 73 (agreeing that asking the question was part of his trial strategy and that there was a tactical reason to ask it). Counsel's explanation for his strategy is consistent with his line of questioning at trial, where Defendant was asked numerous questions to distance and distinguish Defendant from Fuller, to contrast Fuller's motive with Defendant's lack of motive. E.g., N.T. Trial, Vol. XII, 2/28/2017, at 260–68; N.T. Trial, Vol. XIII, 3/1/2017, at 17–18, 23–24, 29–38, 48–56, 66–75. Because Defendant testified, the Commonwealth could thus attempt to impeach Defendant's credibility by referring to his pre-arrest silence, and it is also part of a reasonable trial strategy to preemptively introduce this information on direct examination. Cf. Commonwealth v. Pursell, 555 Pa. 233, 268–69, 724 A.2d 293, 311 (1999) (finding a reasonable strategic basis to introduce a testifying defendant's *crimen falsi* convictions on direct examination).

Finally, the Court finds that Defendant has not shown that he was prejudiced by his attorney's question. "[T]he mere revelation of silence does not establish innate prejudice." DiNicola, 581 Pa. at 563, 866 A.2d at 336–37 (citing Whitney, 550 Pa. 618, 708 A.2d at 478). Here, counsel's question on direct examination was not prejudicial because it was part of his strategy of showing that Defendant's lack of involvement meant that he had no reason to cooperate. N.T. PCRA Hearing, 9/27/2021, at 14–15. Following Defendant's counsel's objection in chambers, the Court warned the Commonwealth not to comment on or implicate Defendant's right

47

to remain silent, which the Commonwealth followed. N.T. Trial, Vol. XIII, 3/1/2017, at 89–90. The Commonwealth's question and argument merely reiterated Defendant's position, that he did not cooperate, unlike Tyrone Fuller. Therefore, none of the references to Defendant's noncooperation with authorities suggested that this was a tacit admission of his guilt, and Defendant has not shown that these prejudiced him.

The reality is that the evidence of Defendant's guilt in this case was overwhelming, as indicated in the opinions previously entered in this case. Defendant has been convicted by two unanimous juries, and there is no reason to think that his conviction was the result of his trial counsel's comparison of Tyrone Fuller's self-interested action in seeking a plea agreement with Defendant's continued assertion that he was not involved. E.g., N.T., PCRA Hearing, 09/27/2021, at 50 (defendant's counsel testifying that "it was true he didn't go running to the District Attorney's Office like the other individuals asking for a deal, and I believe I presented to the jury in the context of, you know, he had nothing to contribute because he was not involved, and that was the implication."). Defendant's claim has no merit. Because it has no merit, it is denied.

## P. Defendant's counsel was not ineffective for not requesting Defendant's presence at sidebar or in chambers or regarding lack of communication with Defendant concerning discussions held at sidebar or in chambers.

Defendant's sixteenth, seventeenth, and eighteenth issues, the second, third, and fourth issues raised in the Second Amended PCRA Petition, are claims that trial counsel was ineffective for not seeking to have Defendant present at conferences at sidebar or in chambers, and for not communicating with Defendant concerning those conferences. Specifically, it appears that Defendant takes issue with the conferences held at side bar and in chambers which dealt with the issue of Defendant's right to silence and counsel's question concerning whether Defendant had cooperated with law enforcement.

48

At the PCRA hearing, Defendant's trial counsel testified that he explains the right to silence to his clients and the right not to testify. N.T., PCRA Hearing, 09/27/2021, at 12. Counsel was questioned about how he conferred with Defendant, and how Defendant was addressed by the Court, regarding other issues discussed in chambers and at side bar. Id. at 27 (conference regarding Tyrone Fuller's refusal to testify), 29-34 (conference regarding jury). Defendant himself indicated when he testified that trial counsel did consult with him regarding the discussions held in chambers or at side bar. Id. at 99. Thus, Defendant appears to argue that his trial counsel was ineffective only for not making Defendant present at, or conferring with him concerning, the conferences held at side bar or in chambers on the issue of the right to remain silent.

Defendant's trial counsel and Defendant himself testified during the PCRA hearing that counsel had consulted with Defendant regarding the general trial strategy of discrediting Fuller by showing that he had taken a deal with the Commonwealth while Defendant had not. Id. at 29-34, 64, 74, 92. Defendant wanted to testify in order to tell the jury his side, and waived his right to remain silent. Id. at 76-77, 101. The crux of Defendant's issue, distilled down to its essence, thus appears to be he did not know that his trial counsel would ask him the specific question about whether he went "running to the DA's Office to cooperate." N.T., PCRA Hearing, 09/27/2021, at 17. Defendant objects that he was not notified of this question in advance under the theory that it caused him to waive his constitutional right to silence.

As with the previous issue addressed in this Opinion, Defendant's claim has no merit simply because, notwithstanding what prior counsel testified to at the PCRA hearing, and contrary to what current counsel has argued in this case, trial counsel's question to Defendant concerning cooperation could never have caused Defendant to unknowingly waive his right to remain silent; that right had already been knowingly waived by Defendant himself when he elected to testify.

49

Molina, at 493-94, 104 A.3d at 447 (quoting Raffel v. U.S., 271 U.S. 494, 497, 46 S. Ct. 566, 70 L. Ed. 1054 (1926) ("His waiver is not partial; having once cast aside the cloak of immunity, he may not resume it at will, whenever cross-examination may be inconvenient or embarrassing.")). Accord Bolus, 545 Pa. at 113, 680 A.2d at 844; Kuder, 62 A.3d 1038. As a testifying witness who had been properly advised of this right not to testify by both counsel and the Court, and who had knowingly, voluntarily, and intelligently waived that right, Defendant had waived his right to remain silent in the face of cross-examination.

Moreover, as indicated in the Court's consideration of the previous issue, the testimony at the PCRA hearing from both trial counsel and Defendant make it abundantly clear that, although the specific form of the question may not have been proposed to Defendant prior to its asking, the substance of the question was well in line with the general trial strategy contemplated by both trial counsel and Defendant. Additionally, as explained previously, the Commonwealth was limited by the Court in its response to the issue, and the question and argument raised by the Commonwealth did not implicate Defendant's right to silence. Nor is it clear, given the volumes of evidence at trial concerning Defendant's illegal actions of being involved in an ongoing conspiracy to deliver heroin, that this specific issue could in any way have substantially prejudiced Defendant.

Because Defendant's issues have no arguable merit, because Defendant has failed to prove that trial counsel did not have a strategic basis, and because Defendant was not prejudiced, counsel was not ineffective. Because counsel was not ineffective, Defendant's issues have no merit and are denied.

## IV. CONCLUSION

For the aforementioned reasons, the claims raised in Defendant's PCRA Petition, Amended PCRA Petition, and Second Amended PCRA Petition are all contrary to the record and without

merit. Because each of his claims are without merit, the Court will enter an order denying Defendant's request for relief pursuant to the Post Conviction Relief Act.

BY THE COURT:

_Kym Resto_
_____ J.

BY THE COURT

2021 DEC 20 A 11:23

KIM TESLA
JUDGE

51